MHN

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
Eastern Division

**FILED**

JAN 2 3 2008 *aew*
1-23-2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

MICHAEL WEST,                          )

    Defendant-Movant,          )

vs.                                    )          Case No.  07C 6792
                                                  Judge Manning
UNITED STATES OF AMERICA,              )

    Plaintiff-Respondent.      )

## MEMORANDUM OF LAW IN SUPPORT OF 28 USC §2255

**COMES NOW** Movant Michael West, **pro se** and petitions this
Court pursuant to 28 U.S.C. §2255 to vacate, Set Aside, or
Correct his sentence. This, for the grounds set forth in his
Motion filed earlier with this Court. In support Movant states
as follows.

### Factual Background:

On June 2, 2004, a grand jury sitting in this Courts
district charged Michael West by indictment with conspiracy to
violate 18 U.S.C. §§1791(a)(1) and (a)(2) in violation of 18
U.S.C. §371 (Count 1); conspiracy to possess with intent to dis-
tribute heroin in violation of 21 U.S.C. §846 and 18 U.S.C. §2
(Count 2); possession with intent to distribute heroin in vio-
lation of 21 U.S.C. §841(a)(1) (Count 4); possession of contra-
band while an inmate in prison in violation 18 U.S.C. §1791(a)
(2) and (b)(1) (Count 5). Mr. West entered into a written plea
agreement with the government on September 9, 2005, and agreed to
plead guilty to Counts 1 and 5 of the indictment, and to agree

to additional stipulated conduct regarding another offense. A copy of the plea agreement is attached hereto and incorporated herein by reference and marked as **Movant's Exhibit 1**. The district court held a change of plea hearing on that same date.

The united States Probation Office prepared a Presentence Investigation Report ("PSR") on November 30, 2005. The district court held a sentencing hearing on March 9, 2006, and sentenced Mr. West to 120 months in prison, three years supervised release, a $200 special assessment, and $61,943.29 in restitution. Mr. West filed a timely notice of appeal on March 17, 2006. On October 3, 2006 the Federal Public Defenders Office filed an "Anders" Brief with the Seventh Circuit Court of Appeals. On September 9, 2006 Mr. West filed a Motion to Dismiss Counsel Of Record with the Appellate Court. The Court took this motion as a response to its "Show Cause Order" directed at Mr. West in reference to the filed "Anders Brief". On December 7, 2006 the Seventh Circuit Court of Appeals Accepted the Anders Brief and dismissed Mr. Wests Appeal. This Motion pursuant to 28 U.S.C §2255 follows:

### SUMMARY OF THE ARGUMENT AND REQUEST FOR EVIDENTIARY HEARING

The Movant Michael West, proceeding pro se argues the following grounds in this motion.

**Ground 1: Illegal Sentence**

Mr. West has a signed plea agreement. This, which is governed by the 2003 Edition of the Sentencing Manual. In the aforementioned manual §§3D1.2(d) and 3D1.4(c), when the government argued and the Court accepted at sentencing, that counts 1 and 5, for which West

pleaded guilty were "grouped" pursuant to §3D1.2(b). Even though the government at sentencing argued that the counts were **NOT** grouped. The plea agreement (**P.A.**) specifically states at page 13 paragraph d[1] that all counts will not be grouped. A copy of the plea agreement is attached hereto and incorporated herein by reference and marked as **Movant's Exhibit 1.**

The fact that the sentencing court ignored the relevancy of these facts at sentencing makes the present sentence void.

## Ground 2: Ineffective Assistance of Trial Counsel

Because trial counsel failed to act in a manner of any other competent attorney by not preserving the issue of Ground 1 on the record, it eradicated Mr. Wests rights to a direct appeal of this issue. This, which was guaranteed by the signed plea agreement. This action forced Mr. West to openly argue this point to the sentencing court, trying in a laymens way to preserve the issue.

## Ground 3: Ineffective Assistance of Appellate Counsel

Movants Appellate Counsel filed an "Anders" brief with the Seventh Circuit Court of Appeals, arguing that Mr. West had no cognizable grounds to seek an appeal. This action was in error. On page 17 Line 17 of the Sentencing Transcripts (**S.Tr.**), the Sentencing Court specifically states to Mr. West " So you still have the right to appeal." A copy of the sentencing transcripts are attached hereto and incorporated herein by reference and marked as **Movant's Exhibit 2.** Thus, the sentencing court on the record informed Mr. West that if he still believed that the calculation of his sentence was wrong that the issue was preserved

---

[1] The following abbreviations are used herein: Plea Agreement: "P.A. p. at_____"; Sentencing Transcripts: "S.Tr. p. at L._____".

for direct appeal therefore, negating the "Anders" brief and its assumptions.

## Ground 4: Illegality of the Sentence

When movant was sentenced by the court, the judge specifically stated that he would be sentenced to 120 months less credit for the time that he had been awaiting trial. **S.Tr. p.44 at L.12.** The Bureau of Prisons has stated that Mr. West cannot receive credit for this jail time (36 months). Without the credit specifically granted by the court to Mr. West he is now being forced to serve a total of 156 months. Thus, making this an illegal sentencing not comporting to the direction of the sentencing court. If the court did not have the authority to grant Mr. West the 36 months of jail time credit then Mr. West should have been sentenced to 84 months. 84 months in prison, plus, 36 months jail credit would equal the 120 months agreed to in the signed plea agreement. Other-wise Mr. West is being forced to serve an additional 36 months that was not part of the signed plea.

Movant alson requests that this court hold an evidentiary hearing. This hearing will establish the points raised herein. The fact that the question of the effectivness of Mr. Wests trial counsel was never presented to the court during the sentencing phase, augments this request.

**THEREFORE** Movant respectfully asks this court to grant him an evidentiary hearing on the aforementioned grounds for relief.

## POINT I

**The Sentence Imposed Was Illegal And Violated The Signed Plea Agreement That Was Agreed To By All The Parties. Further, Placing Mr. West As The Leader In The Conspiracy Violated The Sixth Amendment To The United States Constitution And The Due Process Clause Of The Fourteenth Amendment.**

### Standard Of Review:

The standard of review for Mr. West's 2255 Motion on this issue is augmented within the cases of **United States v. Cruz, 58 F.3d 550 (10th Cir. 1995); United States v. Mapps, 990 F.2d 58 (2nd Cir. 1993); Blakely v. Washington, 124 S.Ct. 2531 (2004); Apprendi v. New Jersey, 530 U.S. 466 (2000).** All of the Grounds presented by Mr. West in his motion involve constitutional issues of law and ineffective counsel.

### A R G U M E N T

The issue of the illegal sentence that trial counsel failed to preserve but which Mr. West feels that he preserved, had meritorious implications under the existing guidelines and within the elementary burden of proof principals. The sentencing Transcript clearly show the relevance of this issue. At **S.Tr. p. 5,6 at L. 12-25; 1-11,** the following dialogue took place between Defense Counsel Donald V. Young and the Court:

> **Mr. Young:**   Right. If I could point out one other, again, this doesn't change the final outcome, but on line 187 where it references **2P1.2(c),** and specifies an offense level of 26 based upon in excess of 5 grams, I believe that really should be level 14. Again, I don't think this changes the total level. Excuse me one second, judge. (Discussion off the record.)

> **The Court:**   Do you want to pass this matter so you can confer with Mr. West?

| | |
|---|---|
| **Mr. Young:** | Judge I have conferred with Mr. West, and it basically comes down to an interpretation of Section 1791. I understand Mr. West's position; however I don't agree with his position. 1791 specifies in subparagraph (c)--- |
| **The Court:** | Go ahead |
| **Mr. Young:** | In the definition section, Judge, of 1791, sub-paragraph (c) refers to a narcotic methamphetamine, et cetera, and Mr. West's position is that because subparagraph (c) does not specifically refer to heroin that the subsection is not applicable. I do not agree with Mr. West, and I've shown him some authority. |

As can be seen from this exchange Mr. Young actually had no idea as to what Mr. Wests arguments were. The issue of 1791 was never the issue presented to him by Mr. West. The correct offense level, based upon the conclusion Mr. West believed  he was de-livering heroin was 28. With Mr. Wests criminal history category of 6 the guideline rage was 120 to 162 months. U.S.S.G. Ch. 5 Pt. A, Sentencing Table. However since the plea agreement specifically states that Counts 1 and 5 are not to be grouped, the statutory maximum for conspiracy under 18 U.S.C. §371 is 5 years. This maximum limits the sentence to 5 years.

Pursuant to to 3D1.4(c), the combined offense level for the offenses charged in Counts 1 and 5 is a level 28, because the offense level, for the offense charged in Count 5 is (9) or more levels less serious than the offense level of Count 1. Count 5 is a less serious offense.

If there are several counts or groups in an indictment, and one of those counts are more serious than all the others, there will be no increase in the offense level resulting from additional

counts and ordinarily the court will have latitude to impose
added punishment if need be, **U.S.S.G. 3D1.4 Commentary.** Therefore,
Count 5 must be disregarded according to 3D1.4(c) and the plea
agreement **(P.A. P. 12).** This leaves the Court with count 1 as the
most serious offense and the only offense that the court can
impose a sentence, up to the maximum range authorized by statute.
In this case that is governed by 18 U.S.C. §371 (5 years).

§§3D1.1 through 3D1.4 explains this procedure for determining
the appropriate sentence along with the provisions of chapter 5.
To be clear, this section refers the court to chapter 5 of the
U.S.S.G. in order to determine the total punishment to be imposed
upon the combined offense level. **See 3D1.5 Commentary; SG1.1(a).**

In **United States v. Mapps, 990 F.2d 58 (2nd Cir. 1993)**, the
government agreed that the U.S.S.G. 2P1.2 would govern the offense
of conspiracy to provide contraband to prisoners. This, with the
offense level dependant on the type of contraband. Mapps offense
level was calculated at 26, based on cocaine that he supplied to
inmates. Mapps pleaded guilty to conspiracy to violate 18 U.S.C.
§ 1791 (a)(1) and conceded conduct punishable by 18 U.S.C. 1791
(b)(1), with his offense level based on U.S.S.G. 2P1.2(c)(1). The
court stated clearly that the degree of Mapps punishment was to
be determined by the guidelines but limited by maximum penalty
permissable by 18 U.S.C. §371. **Also See: United States v. Cruz,
58 F.3d @ 554[6].**

## Enhancement Based On §3B1.1 Leadership Role:

## Standard of Review:

The standard of review for this issue **Blakely v. Washington,**

124 S.Ct. 2531 (2004). Because the district court plainly erred by sharpley increasing the penalty range it applied to Mr. West based on the court's findings by a mere propoonderance of evidence that Mr. West was in fact the leader in the conspiracy. This violated the Fifth and Sixth Amendment principals set out within the **Blakely** decision.

## ISSUE II OF POINT I ARGUMENT

Mr. Wests' guilty plea admissions no where in the record support the fact that he in any way was the leader of the conspiracy charged. The guilty plea admission that he smuggled heroin into a correctional facility supported a base offense level of 26, U.S.S.G. §2P1.2(a)(2). For a person in Criminal History Category VI, the penalty range to this offense is 120-150 months, U.S.S.G., Ch. 5 Pt. A. Subtracting two levels for acceptance of responsibility, and one level for permitting the Court to allocate its resources efficiently, within the meaning of Guideline §3E1.1(b), an offese level of 23 subjects a defendant in Criminal History Category VI to a penalty range of only 92-115 months. Id.

The District Court, however, applied an enhanced penalty range requiring an **minimum** prison term of 130 months because the judge found by a mere preponderance of evidence that Mr. West was a organizer/leader of the conspiracy as defined by U.S.S.G. §3B1.1(a). The Supreme Court held in **Blakely v. Washington, 124 S.Ct. 2531 (2004)**, that the Fifth and Sixth Amendment rights to jury findings of facts beyond a reasonable doubt applied to any fact the law required as a basis to increase the penalty range above the maximum authorized by the facts found by a jury or admitted by the defendant.

124 S.Ct. at 2537.

**Blakely** clarified the due process and fair trial principals articulated in **Apprendi v. New Jersey, 530 U.S. 466 (2000)**. The Court ruled in **Apprendi** that any fact that increases the penalty for a crime beyond the prescribed "statutory maximum" must be submitted to a jury, and proved beyond a reasonable doubt. Id., at **490. Blakely** explained that the "statutory maximum" to which **Apprendi** refers "is the maximum sentence a judge may impose **soley on the basis of the facts reflected in the jury verdict or admitted by the defendant.**" Blakely v. Washington, 124 S.Ct. at 2537 (italics in original).

**Blakely** struck down a Washington State statute under which the sentencing judge imposed a sentence above a "standard" range for offenses set out in the statute, if the judge found that aggravating factors listed in the statute justified an enhancement. The trial court in **Blakely** followed this procedure to impose an extraordinary sentence of 90 months upon a defendant whose admissions upon pleading guilty to 2nd degree kidnapping supported only a 49-53 month range. The Supreme Court reversed **Blakely's** sentence because the exceptional sentence imposed against him was based on facts that Blakely did not admit and that no jury had found beyond a reasonable doubt. **124 S.Ct. at 2537.** The Court built the ruling on the principal articulated in **Apprendi v. New Jersey, 530 U.S. 466(2000),** that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id., 530 U.S. at **490.**

In other words, a judge may not apply an enhanced penalty range based on facts that have not either been admitted by the defendant or found by a jury beyond a reasonable doubt. **Id.** The facts upon which the Washington judge based the "exceptional" sentence "were neither admitted by Blakely nor found by a jury." The state court judge acted in excess of his proper, constitutional authority by finding additional facts on which an enhanced penalty was based. **Blakely v. Washington, 124 S.Ct. at 2537.** The rule of **Apprendi** and **Blakely** gives effect to the Framers' intention that the right to a jury trial would ensure that the people retained control of the judiciary. "**Apprendi** carries out this design by ensuring that the judge's authority to sentence derives wholly from the jury's verdict." **124 S.Ct. at 2539.**

The district court violated this principal in Mr. Wests case by making its own findings by a mere preponderance of evidence that the defendant had a leadership role and was the organizer of the conspiracy as defined by §3B1.1(a). Mr. West never admitted to being the leader nor organizing the conspiracy. The sentence of 120 months could not have been authorized based on the facts that Mr. West admitted to. **(S.Tr. p.3-20).**

The District Court, therefore, violated Mr. Wests Fifth and Sixth Amendment rights to due process and a FAIR JURY trial of all facts necessary to his conviction and punishment when it found by only a preponderance of evidence that the defendant was an organizer and had a leadership role in the conspiracy. Mr. West did not specifically object based on the constitutional right to jury determination of the facts that increased his punishment. This constitutional violation warrents plain error relief under

- 10 -

FED. R. CRIM. P. 52(b) and 28 U.S.C. § 2255 if there was (1) error
(2) that is plain, (3) that  affects substantial rights, and (4) the
error seriously affects the fairness, integrity, or public reputation
of judicial proceedings. **Johnson v. United, 520 US 461, 466-467
(1997).** The record here satisfies all criteria.

## POINT II

**Trial Counsel Failed To Preserve The Issue Of Mr. West Being
Sentenced To An Illegal Sentence, Said Sentence Which Violated
A Signed Plea Agreement, Further Failing To Preserve The Issue
Mr. West Being Relegated To The Role Of Leader/Organizer Of The
Conspiracy. Appellate Counsel Was Ineffective For Filing An
"Anders" Brief Without Properly Investigating The Claims Of The
Case. All Of Which Any Competent Attorney Would Have Completed,
And The Result Would Have Been A Different Outcome.**

### Statndard Of Review:

The Statndard of review for the issue of ineffective assistance
of trial and/or appellated counsel is contained within the precepts of
the prong test set within **Strickland v. Washington, 466 US 688,
80 L.Ed.2d 674, 104 S.Ct. 2052**

## A R G U M E N T

Defense Counsel's failure to preserve claim that  the grouping
of the counts under any section would be a violation of the plea
agreement, also, his failure to preserve the claim that by a mere
preponderance of evidence that Mr. West was categorized as the
leader/organizer of the conspiracy which increased the sentence
for Mr. West, violated the Sixth Amendment was ineffective. Counsel
performed dificiently.

### The First Prong: Deficient Counsel

To show that counsel's performance was deficient, Mr. West
must show "that counsel made errors so serious that counsel was

- 11 -

not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." **Id.** at 687 104 S.Ct. 2052. "[T]he defendant must show that counsel's representation fell below an objective standard of reasonableness." **Id.** at 688, 104 S.Ct. 2052.

Ommission flows directly from Counsels ineffective performance at the sentencing phse of Mr. Wests case. His failure  to to raise the forseeability issues, which were well known at the time of the sentencing  hearing. During this phase of the case Mr. west argued dilligently before the court on these issues. At **S.Tr.** p. 7, L. 18-25 and p. 8, L. 1-4; the following dialogue took place between the Mr. West, the Court, and Mr. Rao, A.U.S.A:

> **The Defendant:** Okay. I understand, judge. I understand exactly what he's saying. I understand that, but I wanted to just say one thing which I don't know if my lawyer understands. I just wanted this put on the record if it was all right, you know, just say one thing. The statutory minimum—I mean the statutory maximum of this case which I've been charged under §371 is a conspiracy. It is a, §371. Thats what brings §1791 (a)(1) into effect by charging me to a level 26. But the statutory maximum don't provide you no more than five years for §371, and it states that in both of the cases that the U.S. Attorney have recited, the **Mapp** and **Cruz** case.

Mr. West continues to argue this point to the Court, seeking a means to correct the invalid misrepresentation of his sentencing guidelines established by the court.  Further, the Court goes on to ask defense counsel to clarify and at **S.Tr.** p. 12, L. 1-25, and p. 13, L. 1-15, the following takes place:

**The Court:**    Mr. Young (defense counsel), do you care to address this?

**Mr. Young:**    Judge I believe I've gone through the calculation a number of times, including with Mr. West, and I believe they are accurate.

**The Court:**    Okay, I was looking for the plea agreement. Normally it's attached to the presentence report, but I don't see it here.

**The Defendant:**    "But I just wanted to ask one question. If it's the the calculation interpretation, does that mean that if they made a mistake in the calculations, you can't argue the calculation?

**The Court:**    If there's a mistake thats one thing.

**The Defendant:**    "Right." Okay that's what I was saying there's a mistake made, and the reason why I said it was a mistake is because if I'm charged with 1791(a)(2), that don't-- I don't fall up under the punishment to be punished under 1791(b)(1), 1791(b)(1) is just a punishment up under 1791(a)(1), and thats punishment. So if I'm charged with 1791(a)(2), thats a mistake. But like I said. I'm not no lawyer or nothing like that. I'm just going by what I read, like I can't be punished up under or cross referenced over to bring me up to level 27. Only if I'm charged with 1791(a)(2), than I can be punished under 1791(b)(1), and its got to be a narcotic under section (c). But I'm charged with 1791(a)(1) in count 5. Thats what I'm charged with. You've got to be charged with 1791 to begin the cross reference to bring it from 13 and bring it up to 26.

**The Court:**    But here is charged with 1791(a)(1), right?

**Mr. Rao:**    Right

**The Defendant:**    Okay. So its in count 1 where 1791(a)(1) is a conspiracy up under 371, which I can't be charged over five years in that count. Because it says that and its plainly stated that no matter 1791 is kicked in, you know, its not a serious enough charge, you're supposed to go

**Defendant Cont:** by the statutory maximum of that case which is.

Defense Counsel was the legal representative, duty bound to a reasonable and competent standard of professionalism in persuing Mr. Wests issues. The fact that others in neutral or in adversarial capacity such as the judge and Assistant United States Attorney did not agree with Mr. Wests position, it should not have been incumbant on Mr. West to argue the points raised. Defense Counsel's deficient performance resulted in Mr. Wests' improper clssification as to his base offense level which resulted in a significantly greater sentence.

## The Second Prong: Prejudice

To establish prejudice, "[t]he defendant must show that there is a reasonable probobility that, but for counsel's unprofessional errors, the result of the proceeding"——in this case, the result of Mr. Wests sentencing——"would have been different. There is a simple explanation of the guidelines that defnse counsel failed to argue, if he had there is a reasonable probability that Mr. Wests sentence would have been lower. A reasonable probability is a probability sufficient to undermine confidence in the outcome." **Strickland, 466 US at 694, 104 S.Ct. 2052.** Counsels failure to raise the issues that are argued in the aforementioned points and to preserve them for direct appellate review satisfies the prejudice prong. If on no other issue than the enhancement under the leadership role, counsel was inneffective and prejudiced Mr. West. **See Nichols v. United States, 501 F.3d 542 (6th cir. 2007).**

## ISSUE II OF POINT II - ARGUMENT

**Appellate Counsels Failure To Investigate The Transcripts Of The Sentencing Proceeding Prejudiced Mr. West, In That He Was Not**

**Allowed To Have A Direct Appeal On The Issues Raised In The Foregoing Memorandum Of Law. If Appellate Counsel Had Investigated They Would Have Realized That Mr. West Himself Had Preserved The Issues Raised.**

Had appellate counsel bothered to get a copy of the sentencing hearing transcripts it would have been clear that the issues that Mr. West wanted raised on direct appeal had been preserved. In point of fact the sentencing judge hereself made mention to Mr. West that he could raise the issue on appeal. By filing an "Anders Brief" with the appellate court appellate counsel prejudiced Mr. West by denying him a direct appeal with proper representation. Thsi by and of itself meets the two prong test in **Strickland, 104 S.Ct. 2052.**

### POINT III

**The Failure Of The Sentencing Judge To Take Into Account That She Did Not Have The Authority To Include Mr. Wests' Jail Time Within His Sentence Amounted To An Illegal Sentence, Since Only The United States Attorney General Through The Bureau Of Prisons Can Award Jail Credit.**

### A R G U M E N T

At the sentencing hearing when Judge Manning led Mr. Wests to believe that the time he had already served awaiting trial (36 months) would be credited to his sentence, she at the very least gave a false expectation and at the worst an illegal sentence. At **S.Tr. p. 44, L. 11-12.,** The judge made it clear that the sentence imposed was 120 months less the thirty six (36) months jail credit. That would have left Mr. West with a total of eighty four (84) months left to serve. Instead Mr. West is being forced to serve 156 months. The defendant had no way of knowing that the State of Illinois was going to give him credit for the 36 months on his state sentence. The fact that defense counsel, the A.U.S.A., nor the judge brought this point forward in the proceeding shows a lack of understanding at the very least as to what the law reads. At the very least Mr. West should

- 15 -

have been allowed to make the argument for a downward departure based on U.S.S.G. §5K2.0 based on the three years of incarceration already completed on that sentence. **See United States v. Morales-Madera, 352 F.3d 1, 62 Fed Rules Evid Serv 1426, cert den(2004) 541 US 965, 158 L.Ed 2d 410, 124 S.Ct. 1728.** 18 U.S.C. §3585(b) controls the calculation of credit for time served in official detention prior to comencement of the sentence, and the Attorney General, not the sentencing court, is responsible for that calculation; Therefore, any defendant——who was sentenced based on a guilty plea can only have his jail time credited by the Attorney General and not the court. Therefore the sentence as a matter of law was and is illegal. When the district court took upon itself the duty of granting Mr. West his time spent in custody, irrelevant of 18 U.S.C. 3585(b), it performed outside of its jurisdiction. Mr. Wests belief that the thirty six months that he had already been incarcerated was going onto his sentence is evident within the record of the sentencing  transcripts.

## C O N C L U S I O N

**WHEREFORE,** Defendant/Movant, Michael West, pro se asks this Court for the aforementioned stated reasons, to vacate, set aside his sentence, **Or In The Alternative,** Dfendant/Movant asks this Court to resentence him pursuant to the calculations based within this Memorandum.

Dated: January 4, 2008                    Respectfully Submitted,


                              _Michael West_____
                              Michael West, pro se
                              Reg. No. _16012424_ BL-128
                              USP-Leavenworth
                              P.O. Box 1000
                              Leavenworth, Kansas  66048




## C E R T I F I C A T E   O F   S E R V I C E

     The above signed hereby certifies that a true and correct copy
of the foregoing was placed in the United States Mails, First Class,
postage pre-paid, this 14th day of January, 2008, to:

                      **United States Attorney**
                **For the Northern District of Illinois**
                **219 South Dearborn Street, Room 500**
                      **Chicago, Illinois  60604**

All by placing same in the mails at USP-Leavenworth, Kansas.


                              - 17 -

# E X H I B I T S

1.    Plea Agreement Between The United States and Michael West

2.    Sentencing Transcripts of Case No. 04 CR 298-1
      United States Of America, Plaintiff, v.
      Michael West, Defendant.

MOVANT'S EXHIBIT "1"

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No.    04 CR 298-1 |
| | ) | |
| vs. | ) | |
| | ) | Judge Blanche Manning |
| MICHAEL WEST | ) | |

## PLEA AGREEMENT

This Plea Agreement between the United States Attorney for the Northern District of Illinois, PATRICK J. FITZGERALD, and the defendant, MICHAEL WEST, and his attorney, DONALD V. YOUNG, is made pursuant to Rule 11 of the Federal Rules of Criminal Procedure and is governed in part by Rule 11(c)(1)(C) as outlined in paragraph 17 below.

This Plea Agreement is entirely voluntary and represents the entire agreement between the United States Attorney and defendant regarding defendant's criminal liability in Case Nos. 04 CR 298-1.

This Plea Agreement concerns criminal liability only, and nothing herein shall limit or in any way waive or release any administrative or judicial civil claim, demand or cause of action, whatsoever, of the United States or its agencies. Moreover, this Agreement is limited to the United States Attorney's Office for the Northern District of Illinois and cannot bind any other federal, state or local prosecuting, administrative or regulatory authorities except as expressly set forth in this Agreement.

By this Plea Agreement, PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, and the defendant, MICHAEL WEST, and his attorney, DONALD V. YOUNG, have agreed upon the following:

1.    Defendant acknowledges that he has been charged in the indictment in Case No. 04 CR 298-1: (1) with conspiring and agreeing with others to commit an offense against the United States, namely: (a) to provide to an inmate of a prison a prohibited object, namely heroin, a Schedule I Narcotic Controlled Substance, in violation of Title 18, United States Code, Section 1791(a)(1); and, (b) to obtain and possess and to attempt to obtain and possess, as inmates of a prison, a prohibited object, namely heroin, a Schedule I Narcotic Controlled Substance, in violation of Title 18, United States Code, Section 1791(a)(2), all in violation of Title 18, United States Code, Section 371 (Count One); (2) conspiring and agreeing with others to possess with intent to distribute and to distribute a controlled substance, namely heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 846 and Title 18, United States Code, Section 2 (Count Two); (3) knowingly and intentionally distributing and possessing with intent to distribute a controlled substance, namely, heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Section 2 (Count Four); and (4) being an inmate who knowingly and intentionally possessed prohibited objects, namely heroin, a Schedule 1 Narcotic Drug Controlled Substance, in violation of Title 18, United States Code, Sections 1791(a)(2) and (b)(1) (Count Five).

2.   Defendant has read the charges against him contained in Counts One, Two, Four and Five of the indictment in Case No. 04 CR 298-1, and those charges have been fully explained to him by his attorney.

3.   Defendant fully understands the nature and elements of the crimes with which he has been charged.

4.   Defendant will enter a voluntary plea of guilty to Counts One and Five of the indictment.

5.   Defendant will plead guilty because he is in fact guilty of the charges contained in Counts One and Five of the indictment.  In pleading guilty,  defendant admits the following facts and that those facts establish his guilt beyond a reasonable doubt:

From in or about  November 2003 until in or about March 2004, at Chicago, Illinois, in the Northern District of Illinois and elsewhere, defendant MICHAEL WEST did conspire with co-defendants Mable West, William Davis, Denise West, and Emma Clark, and others to commit an offense against the United States, namely: (1) to provide to inmates of a prison a prohibited object, namely heroin, a Schedule I Narcotic Controlled Substance, and (2) to obtain and possess and to attempt to obtain and possess, as inmates of a prison, a prohibited object, namely heroin, a Schedule I Narcotic Controlled Substance, in violation of Title 18, United States Code, Section 371.

Specifically, on or about February 1, 2004, at Chicago,  in the Northern District of Illinois and elsewhere,  defendant, being an inmate of a prison did knowingly possess a

3

prohibited object, namely heroin, a Schedule I Narcotic Drug Controlled Substance, in violation of Title 18, United States Code, Section 1791(a)(2) and 1791(b)(1).

More specifically, the United States Bureau of Prisons, Metropolitan Correctional Center-Chicago ("MCC"), was a Federal Correctional Institution. The MCC did not allow heroin or other narcotics to be brought into its premises. In addition, the MCC records all outgoing calls made from inmates housed at the MCC and assigns each particular inmate at the MCC with their own unique phone access code ("PAC") number for the purpose of placing outgoing calls. The PAC number operates in a manner similar to a personal identification number and is non-transferrable and is not to be used by anyone other than the assigned inmate.

From November 2003 to March 2004, defendant and co-defendant William Davis ("Davis") were inmates of the MCC and as such were forbidden to possess or distribute heroin to other inmates at the MCC.

On or about January 1, 2004, co-defendant Davis began selling his PAC number to defendant in exchange for United States currency. In or about January 2004, defendant asked Davis if he would accept a visit for defendant and whether Davis would be willing to "swallow" some drugs during the visits in which co-defendant Denise West had agreed to be the visitor. Denise West is one of defendant's sisters. Defendant paid Davis approximately $20 for his agreement to swallow the balloon containing heroin.

4

On January 21, 2004, defendant caused Individual A to wire co-defendant Mable West, another sister of defendant, approximately $999 via Western Union as payment for smuggling heroin into the MCC and to purchase additional heroin.

On January 27 and 28, 2004, co-defendant Davis provided defendant with the use of his PAC number to contact co-defendant Denise West in order to have Denise obtain and then smuggle heroin into the MCC. On two separate occasions on January 28, 2004, defendant used Davis' PAC number to call Denise West for the purpose of arranging for the delivery of heroin into the MCC. During the calls, defendant and Denise West discussed smuggling heroin into the MCC. Denise West used code words such as "balloons" when discussing how the heroin was going to be smuggled into the MCC.

On or about February 1, 2004, a few hours before a regularly scheduled visiting time, defendant walked up to Davis and told him he was getting a visit that day and told Davis that the visitor's name was co-defendant Emma Clark ("Clark"). Defendant had arranged for Davis to receive this visitor in order for the visitor to pass heroin to Davis, which Davis, in turn, would swallow and bring back to his cell for later distribution in the MCC. On the same day, Mable West provided Denise West with Mable West's driver's license card for the purpose of allowing Denise West to pose as Mable West in order to gain admission into the MCC to deliver heroin. Denise West and Emma Clark traveled to the MCC carrying heroin and smuggled the heroin into the MCC.

accident, including the nature and extent of resulting damage and bodily injuries, when, in truth no such accident had occurred.

On or about March 17, 2003, defendant, while incarcerated, made a telephone call from the Northfork Correctional Facility in Sayre, Oklahoma, to an individual in Chicago, Illinois, who used three-way calling to place a call to Geico's claims office in Macon, Georgia while defendant remained on the line. In the ensuing discussion with a Geico representative, defendant, using an alias name and pretending to be a legitimate insured of Geico, falsely claimed that he had been involved in an automobile accident with another automobile on March 17, 2003 ("the March 17 fictitious accident"), and that Jones owned the other automobile involved in the March 17 fictitious accident. Defendant also falsely claimed that Bradley and Gibson were occupants of the other automobile and that they had sustained bodily injuries resulting from the March 17 fictitious accident. Geico assigned claim #0175697740 to defendant's fraudulent claim.

From on or about March 18, 2003, through on or about March 25, 2003, Jones, Bradley, and Gibson, while in Chicago, each had several telephone conversations with Geico representatives located at Geico's claims facility in Macon, Georgia, in which they falsely represented that they were claimants in the false claim made by defendant. In these telephone conversations, Jones, Bradley, and Gibson negotiated insurance settlements to settle their false claims respectively for approximately $1,305.03, $1,500, and $1,500. Jones, Bradley, and Gibson intended to retain a portion of the fraudulently obtained funds for their

own use and, as defendant knew, to provide defendant or others with the remaining portion. The scheme, however, was detected before Jones, Bradley, or Gibson received any of the insurance proceeds from the March 17th fictitious accident claim.

The information in paragraph 7 is merely intended to provide a factual basis for the defendant's stipulation and is not intended to be a detailed statement summarizing everything that the defendant knows about the crimes with which he has been charged.

8.    Defendant also acknowledges that for the purpose of calculating his sentence under the U.S. Sentencing Guidelines, the following conduct, to which he stipulates, constitutes relevant conduct under Section 1B1.3 of the Guidelines to Count One of the superseding indictment in Case No. 03 CR 304-1:

Defendant acknowledges that from on or about October 24, 2001, and continuing to at least on or about March 25, 2003, he participated in a scheme to defraud insurance companies of which the scheme described in paragraph 7 was a part.

During the scheme, defendant, while incarcerated, made telephone calls from the Northfork Correctional Facility in  Sayre, Oklahoma, to Bradley and others in Chicago, Illinois, who, in turn, used three-way calling to place calls to insurance companies' claims offices while defendant remained on the line. Defendant thereafter filed false claims with the companies in which he falsely claimed that he and others, including Jones and Bradley, had been involved in automobile accidents. With defendant's knowledge, Jones, Bradley, and other false claimants kept some of the proceeds received as a result of the false insurance

10

claims and arranged for the remaining amount to be distributed to defendant or others involved in the scheme. Defendant organized and orchestrated the activities of at least five individuals who served as false claimants during the course of the scheme.

As a result of defendant's scheme, defendant filed or caused to be filed false insurance claims totaling approximately $113,783.95. Of this amount, insurance companies paid out approximately $61,943.29 to false claimants.

9.     For purposes of calculating the guidelines promulgated by the United States Sentencing Commission pursuant to Title 28, United States Code, Section 994, the parties agree on the following points:

a.     This plea agreement is governed by the November 5, 2003, edition of the Guidelines Manual.

b.     For Case No. 04 CR 298-1, the guideline calculations are as follows:

(1)     The base offense level for the offenses charged in Count One of the indictment is level thirteen pursuant to Guideline § 2P1.2 (a)(2) because the object smuggled into the MCC was heroin, a narcotic drug.

(2)     The offense level for the offenses charged in Count One of the indictment is increased to level 26 pursuant to Guideline § 2P1.2(c)(1), because the object of the offense was the distribution of a controlled substance and the resulting offense level under Guideline § 2D1.1 is less than a level 26.

11

(3)    The offense level for the offenses charged in Count One of the indictment is increased an additional four levels pursuant to Guideline § 3B1.1(a) based on defendant's role as an organizer and leader of criminal activity that involved five or more participants.

(4)    The base offense level for the offenses charged in Count Five of the indictment is level thirteen pursuant to Guideline § 2P1.2(a)(2) because the object smuggled into the MCC was heroin, a narcotic drug.

(5)    The offenses charged Counts One and Five of the indictment are not grouped together pursuant to Guideline § 3D1.2(d), which specifically excludes the grouping of all offenses covered by Guideline § 2P1.2. Pursuant to Guideline § 3D1.4(c), the combined offense level for the offenses charged in Counts One and Five is level 30 because the offense level for the offense charged in Count Five is 9 or more levels less serious than the offense level for the offense charged in Count One.

c.    For the stipulated offense set forth in paragraph 7, pursuant to Guideline § 1B1.2(c), the guideline calculations are as follows:

(1)    The base offense level for the offense charged in Count One of the superseding indictment is level seven pursuant to Guideline § 2B1.1(a).

(2)    The offense level for the offense charged in Count One of the superseding indictment is increased eight additional levels pursuant to Guideline

12

§2B1.1(b)(1)(E) due to the actual and intended loss being more than $70,000, but less than $120,000.

(3)    The offense level for the offense charged in Count One of the superseding indictment is increased an additional four levels pursuant to Guideline § 3B1.1(a) based on defendant's role as an organizer and leader of criminal activity that involved five or more participants.

d.    The offense of conviction and stipulated offense are not grouped under Guideline § 3D1.2. Pursuant to Guideline § 3D1.4(c), the combined offense level for these two offenses is level 30 because the offense level for the offense of conviction is 9 or more levels less serious than the offense level for the stipulated offense.

e.    Defendant has clearly demonstrated a recognition and affirmative acceptance of personal responsibility for his criminal conduct. If the government does not receive additional evidence in conflict with this provision, and if the defendant continues to accept responsibility for his actions, within the meaning of Guideline § 3E1.1, a two-level reduction in the offense level is appropriate.

f.    Defendant has timely notified the government of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the Court to allocate its resources efficiently, within the meaning of Guideline § 3E1.1(b). Accordingly, at the time of defendant's sentencing, the government will move for an

additional 1-level reduction in the offense level, provided the Court determines the offense level to be 16 or greater prior to the operation of Guideline § 3E1.1(a).

       g.    Defendant understands that, in imposing the sentence, the Court will be guided by the United States Sentencing Guidelines. The defendant understands that the Guidelines are advisory, not mandatory, but that the Court must consider the Guidelines in determining a reasonable sentence.

       h.    Based on the information known to the government at the time of this agreement, defendant's criminal history consists of the following convictions:

     (1)    A July 20, 1989, conviction in the Circuit Court of Will County for theft for which defendant received 4 years imprisonment in the Illinois Department of Corrections ("IDOC"). Pursuant to Guideline §§ 4A1.1(a) and 4A1.2(e)(1), three (3) criminal history points are assessed for this conviction.

     (2)    Convictions in the Circuit Court of Cook County for: possession of a controlled substance with intent to deliver on April 26, 1993; strong arm robbery on April 29, 1993; and theft on May 6, 1993 for which defendant received concurrent sentences of 4 years imprisonment in IDOC. Pursuant to Guideline §§ 4A1.1(a), 4A1.2(a)(2), and 4A1.2(e)(1), three (3) criminal history points are assessed for each of these convictions for a total of nine (9) criminal history points.

     (3)    An October 20, 1993, conviction in the Circuit Court of Cook County for theft for which defendant received 1 year imprisonment in the IDOC. Pursuant to Guideline §§ 4A1.1(b) and 4A1.2(e)(2), two (2) criminal history points are assessed for this conviction.

     (4)    May 25, 1994, convictions in the Circuit Court of Cook County for robbery and possession of a stolen motor vehicle for which defendant received 2 years probation each. Pursuant to

14

Guideline §§ 4A1.1(c) and 4A1.2(e)(2), one (1) criminal history point is assessed for each of these convictions for a total of two (2) criminal history points.

(5)   Convictions in the Milwaukee County Circuit Court for: two counts of conspiracy to commit insurance fraud on January 22, 1996; resisting and obstructing an officer on December 8, 1995; and false insurance claim on December 8, 1995 for which defendant received an aggregate sentence of 14 years imprisonment in the Wisconsin Department of Corrections ("WDOC"), and for attempt theft by fraud on January 22, 1996, for which defendant received a concurrent sentence of 5 years imprisonment in the WDOC.    Pursuant to Guideline §§ 4A1.1(a), 4A1.2(e)(1), and 4A1.2(a)(2), three (3) criminal history points are assessed for these convictions.

(6)   An August 8, 2000, conviction in the Circuit Court of Cook County for: insurance fraud, aggravated insurance fraud, and conspiracy to commit insurance fraud for which defendant received 7 years imprisonment in the IDOC.  Pursuant to Guideline §§ 4A1.1(a) and 4A1.2(e)(1), three (3) criminal history points are assessed for this conviction.

(7)   Pursuant to Guideline § 4A1.1(d), two (2) criminal history points are assessed because defendant committed the offense charged in Count One of the superseding indictment in Case No. 03 CR 304-1 while he was imprisoned for his conviction in paragraph 7(h)(5).

i.    Based on the facts known to the government, the defendant's criminal history points equal 24 and the defendant's criminal history category is VI.

j.    The defendant and his attorney and the government acknowledge that the above calculations are preliminary in nature and based on facts known to the government as of the time of this Agreement. The defendant understands that the Probation Department will conduct its own investigation and that the Court ultimately determines the facts and law

15

relevant to sentencing, and that the Court's determinations govern the final Sentencing

Guidelines calculation. Accordingly, the validity of this Agreement is not contingent upon

the probation officer's or the Court's concurrence with the above calculations.

10.   Errors in calculations or interpretation of any of the guidelines may be

corrected by either party prior to sentencing. The parties may correct these errors or

misinterpretations either by stipulation or by a statement to the probation office and/or Court

setting forth the disagreement as to the correct guidelines and their application. The validity

of this Agreement will not be affected by such corrections, and the defendant shall not have

a right to withdraw his plea on the basis of such corrections.

11.   Defendant understands that the offense to which he will plead guilty charged

in:

a.   Count One of the indictment carries a maximum penalty of 5 years'

imprisonment, a maximum fine of $250,000, and any restitution ordered by the Court; and

b.   Count Five of the indictment carries a maximum penalty of 20 years'

imprisonment, a maximum fine of $250,000, and any restitution ordered by the Court.

12.   The defendant understands that in accord with federal law, Title 18, United

States Code, Section 3013, upon entry of judgment of conviction, the defendant will be

assessed $200 on the charges to which he has pled guilty, in addition to any other penalty

imposed. The defendant understands that the government will request the court to order the

16

defendant to pay the special assessment of $200 at the time of sentencing with a check or money order made payable to the Clerk of the U. S. District Court.

13.    Defendant understands that by pleading guilty he surrenders certain rights, including the following:

a.    If defendant persisted in a plea of not guilty to the charges against him, he would have the right to a public and speedy trial. The trial could be either a jury trial or a trial by the judge sitting without a jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government, and the judge all must agree that the trial be conducted by the judge without a jury.

b.    If the trial is a jury trial, the jury would be composed of twelve laypersons selected at random. Defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising so-called peremptory challenges. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that defendant is presumed innocent, and that it could not convict him unless, after hearing all the evidence, it was persuaded of defendant's guilt beyond a reasonable doubt and it is was to consider each count of the indictment in Case No. 04 CR 298-1 separately.

17

c.    If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all the evidence, and considering each count separately, whether or not the judge was persuaded of defendant's guilt beyond a reasonable doubt.

d.    At a trial, whether by a jury or a judge, the government would be required to present its witnesses and other evidence against defendant. Defendant would be able to confront those government witnesses and his attorney would be able to cross-examine them. In turn, defendant could present witnesses and other evidence in his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

e.    At a trial, defendant would have a privilege against self-incrimination so that he could decline to testify, and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify in his own behalf.

14.    Defendant understands that by pleading guilty he is waiving all the rights set forth in the prior paragraph. Defendant's attorney has explained those rights to him, and the consequences of his waiver of those rights. Defendant further understands he is waiving all appellate issues that might have been available if he had exercised his right to trial.

15.    Defendant understands that the Indictment in Case No. 04 CR 298-1, the superseding indictment in Case No. 03 CR 304-1, and this Plea Agreement are matters of public record and may be disclosed to any party.

18

16.    Defendant understands that the United States Attorney's Office will fully apprise the District Court and the United States Probation Office of the nature, scope and extent of defendant's conduct regarding the charges against him, and related matters, including all matters in aggravation and mitigation relevant to the issue of sentencing.

17.    This Plea Agreement is governed, in part, by Federal Rule of Criminal Procedure 11(c)(1)(C). That is, the parties have agreed that the sentence imposed by the Court shall include a term of imprisonment of not less than 120 months and not greater than 162 months in the custody of the Bureau of Prisons. The government is free to recommend that the Court impose a term of imprisonment at any point within the applicable guideline range up to, but not exceeding, a term of 162 months. The defendant is free to recommend any term of imprisonment not less than 120 months. Other than the agreed term of incarceration, the parties have agreed that the Court remains free to impose the sentence it deems appropriate. If the Court accepts and imposes a term of imprisonment within the agreed range of incarceration set forth, the defendant may not withdraw this plea as a matter of right under Federal Rule of Criminal Procedure 11(c)(5). If, however, the Court refuses to impose a term of imprisonment within the agreed range of incarceration set forth herein, thereby rejecting the Plea Agreement, or otherwise refuses to accept the defendant's plea of guilty, this Agreement shall become null and void and neither party will be bound thereto.

18.    Regarding restitution, the parties agree that the offense to which the defendant is stipulating as described in Count One of the superseding indictment in Case No. 03 CR

304-1 is an offense against property, which was committed by fraud and deceit. Pursuant to Title 18, United States Code, Section 3663(a)(3), the parties agree to the entry of an order requiring defendant to pay restitution for the stipulated offense and relevant conduct in Case No. 03 CR 304-1. The parties further agree that the actual loss caused by the defendant to: (1) Allstate Insurance is $9,166; (2) Farmers Insurance is $17,765.25; and (3) State Farm Insurance is $35,012.04, and that under 18 U.S.C. § 3663(a)(3), the Court should order defendant to make restitution in this amount, minus any credit for funds repaid prior to sentencing. Defendant agrees to provide complete and truthful information to the Court and the United States Probation Officer regarding all details of his economic circumstances, including all tax returns and related information which may be requested, in order to determine the manner in which and the schedule by which restitution should be paid. Furthermore, defendant understands that he is required to notify the Court and the Attorney General of any material change in his economic circumstances that might affect his ability to pay restitution. Defendant understands that providing false or incomplete information may be prosecuted as a violation of Title 18, United States Code, Section 1001, or as a contempt of the court.

19.   After sentence has been imposed on the counts to which defendant pleads guilty as agreed herein, the government will move to dismiss: (i) the remaining counts of the indictment in Case No. 04 CR 298-1 as to this defendant; and (ii) the indictment in Case No. 03 CR 304-1 as to this defendant.

20

20.    Defendant understands that his compliance with each part of this Plea Agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the Plea Agreement is a violation of the Agreement. He further understands that in the event he violates this Agreement, the government, at its option, may move to vacate the Plea Agreement, rendering it null and void, and thereafter prosecute the defendant not subject to any of the limits set forth in this Agreement, or to resentence the defendant. The defendant understands and agrees that in the event that this Plea Agreement is breached by the defendant, and the Government elects to void the Plea Agreement and prosecute the defendant, any prosecutions that are not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecutions.

21.    Defendant and his attorney acknowledge that no threats, promises, or representations have been made, nor agreements reached, to cause defendant to plead guilty, other than those set forth in this Plea Agreement.

21

22.    Defendant agrees this Plea Agreement shall be filed and become a part of the record in this case.

23.    Defendant acknowledges that he has read this Agreement and carefully reviewed each provision with his attorney.  Defendant further acknowledges that he understands and voluntarily accepts each and every term and condition of this Agreement.


AGREED THIS DATE: _____


_____
PATRICK J. FITZGERALD
United States Attorney

_____
MICHAEL WEST
Defendant


_____
PRAVIN B. RAO
Assistant United States Attorney

_____
DONALD V. YOUNG
Attorney for Defendant

$C\acute{u} \ 1340$

1

```
1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3

   UNITED STATES OF AMERICA,   )  No. 04 CR 298-1
4                               )
           vs.                  )  Chicago, Illinois
5                               )
   MICHAEL WEST,                )
6                               )  March 9, 2006
                   Defendant.   )  11:30 a.m.
7

8                  TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE BLANCHE M. MANNING
9

10 APPEARANCES:

11 For the Government:     MR. PRAVIN B. RAO
                           (United States Attorney's Office,
12                          219 South Dearborn Street, 5th Floor,
                            Chicago, Illinois  60604)
13

14 For the Defendant:      MR. DONALD V. YOUNG
                           (Donald V. Young & Associates,
15                          20 North Clark Street, Suite 1725,
                            Chicago, Illinois  60602)
16

17

18

19

20

21

22

23                      PATRICK J. MULLEN
                       Official Court Reporter
24          219 South Dearborn Street, Room 2128,
                   Chicago, Illinois  60604
25                      (312) 435-5565
```

1          THE CLERK:  04 CR 298, U.S.A. versus Michael West.

2          MR. RAO:  Good morning, Judge.  Pravin Rao on behalf

3    of the United States.

4          MR. YOUNG:  Good morning, Your Honor.  Donald Young

5    for Michael West, who's present for sentencing.

6          MR. JACOBS:  Good morning, Judge.  Ron Jacobs on

7    behalf of U.S. Probation.

8          THE CLERK:  Good morning.  All right.  This matter is

9    before the Court today for sentencing.  Are both sides ready to

10   proceed?

11         MR. RAO:  Yes, Judge.

12         MR. YOUNG:  We are, Your Honor.

13         THE COURT:  All right.  The Court has read the

14   presentence report.  It will be made a part of the record.  It

15   will be filed under seal; however, it will be made accessible.

16   Should a need arise for its use, it will be made accessible to

17   both sides.  I think I asked you this before, but I'll just go

18   through it again.  Are there any factual inaccuracies that

19   either side see in the PSR?

20         MR. RAO:  Judge, nothing for factual inaccuracies,

21   but the Government does have some questions on the guideline

22   calculations.

23         THE COURT:  Well, we'll get to that.

24         MR. RAO:  Okay.

25         THE COURT:  Any factual inaccuracies?

1          MR. YOUNG:  Nothing, Judge, factual.

2          THE COURT:  Okay.  Any legal disputes or legal issues

3    that either side wishes to raise?

4          MR. RAO:  Yes, Judge.  I've talked to both Mr. Young

5    and the probation officer about this.  The guideline

6    calculations on page 6, starting with line 166, it appears

7    there are two counts here, Count 1 and Count 5.  It's the

8    Government's position that the guideline calculations for Count

9    1 should be 26.  It has it listed as 13.  Then for Count 5,

10   starting at the top of page 7 --

11         THE COURT:  Wait a minute.  Excuse me.

12         MR. RAO:  I'm sorry.

13         THE COURT:  On page 7, the offense level set forth in

14   this document, unless I'm reading the wrong thing, says 26.

15         MR. RAO:  It is, Judge.  That is the combined offense

16   level, and the Government has no objection to that.  But for

17   the individual counts, the probation officer -- well, I'll

18   specifically point to line 178 on page 6.

19         THE COURT:  Okay.  I see it.

20         MR. RAO:  Maybe that's the best way to do it.  He has

21   calculated for Count 1 the offense level should be 13.  It's

22   the Government's position that for Count 1 -- and we've laid

23   this out in detail in the Government's version -- the offense

24   level for Count 1 should be 26 instead of 13.  Then for Count

25   5, the other count which is on line 194 of page 7, it says the

1   offense level for that count is 26.  The Government's position

2   is that it should be 13 instead of 26.

3             THE COURT:  So they're reversed.

4             MR. RAO:  It doesn't have any impact on the final

5   offense level.  The Government is not contesting that, but just

6   the accuracy of the calculation.  I've talked with both

7   probation about this and Mr. Young, and Mr. Young has indicated

8   that Mr. West also concurs with that calculation.  So the

9   Government asks --

10            THE DEFENDANT:  Did you --

11            MR. YOUNG:  Just a second.  You'll get a chance.

12            MR. RAO:  -- and there's no objection that the

13   offense should be changed in the PSR to reflect that.

14            THE COURT:  Okay.  It will still remain at a 26 --

15            MR. RAO:  That is correct, Judge.

16            THE COURT:  -- for line 194.

17            MR. RAO:  Yes, that is right.  Just for the

18   individual counts, that needs to be different.

19            THE COURT:  Okay.  Mr. Young?

20            MR. YOUNG:  Actually, Judge, two other corrections in

21   that regard.  On line 192 where it indicates that Mr. West was

22   convicted of 18 U.S.C. 1791(a)(1), he actually pled to

23   1791(a)(2).  I think that could be corrected on its face.

24            MR. RAO:  The Government has no objection to that.

25   That's the reason for the --

5

1          THE COURT:  Okay.  That correction will be made.  I

2    take it there's no objection also to the switching of the 13

3    and the 26?

4          MR. YOUNG:  In terms of the total offense level, I

5    agree with counsel.

6          THE COURT:  That it's 26.

7          MR. YOUNG:  It is 26.

8          THE DEFENDANT:  Judge --

9          THE COURT:  Sir, speak to your lawyer.

10         Mr. Young, your client is trying to say something,

11   but I suggested that he talk to you first.

12         MR. YOUNG:  Right.  If I could just point out one

13   other, again, this doesn't change the final outcome, but on

14   line 187 where it references 2P1.2(c) and specifies an offense

15   level of 26 based upon in excess of five grams, I believe that

16   that really should be a level 14.  Again, I don't think this

17   changes the total offense level.

18         Excuse me one second, Judge.

19      (Discussion off the record.)

20         THE COURT:  Do you want me to pass this matter so you

21   can confer with Mr. West?

22         MR. YOUNG:  Judge, I have conferred with Mr. West,

23   and it basically comes down to an interpretation of section

24   1791.  I understand Mr. West's position; however, I don't agree

25   with his position.  1791 specifies in subparagraph (c) --

1              THE COURT:  Bear with me.  Just hang on for one

2    second.

3              MR. YOUNG:  Sure.

4         (Brief pause.)

5              THE COURT:  Go ahead.

6              MR. YOUNG:  In the definition section, Judge, of

7    1791, subparagraph (c) refers to a narcotic drug,

8    methamphetamine, et cetera, and Mr. West's position is that

9    because subparagraph (c) does not specifically refer to heroin

10   that that subsection is not applicable.  I do not agree with

11   Mr. West, and I've shown him some authority.

12             THE DEFENDANT:  That's not what I'm talking about.

13   I'm talking about --

14             MR. RAO:  Your Honor, if I may, I think I may be able

15   to clear it up.  Because there were two sets of calculations

16   done, one which was done for Count 1, what was charged in

17   Count 1 was a conspiracy to commit 1701(a)(1) and (a)(2).

18   Under the guidelines cross-reference, 2P1.2, there is a

19   cross-reference that says if someone is charged under

20   1791(a)(1) and part of what they're trying to smuggle into the

21   prison is a narcotics substance, such as heroin, then it goes

22   from 13 to 26.  So for Count 1, the offense level is 26.

23             For Count 5, the substantive count with which

24   Mr. West was charged -- and I believe this is what he's trying

25   to say -- he was only charged with 1791(a)(2).  He was not

1   charged with 1791(a)(1).  So the Government does agree that
2   because of that, the offense level for Count 5 cannot be ramped
3   up to 26.  It stays at 13.
4        THE COURT:  13, right.
5        MR. RAO:  But in the long run, it doesn't matter,
6   because when those two offense levels are combined, the
7   combined offense level, as probation has correctly noted, is
8   26.
9        THE COURT:  26, right.
10        MR. RAO:  So for Count 5, he is right.  It is 13.
11   That's exactly what the Government is proposing.
12        THE COURT:  Right, and that's exactly what the
13   Government has proposed to be changed.
14        THE DEFENDANT:  Yes, ma'am.  Yes, ma'am.  I
15   understand.
16        THE COURT:  But it doesn't make a difference in the
17   calculations.
18        THE DEFENDANT:  Okay.  I understand, Judge.  I
19   understand exactly what he's saying.  I understand that, but I
20   wanted to just say one thing which I don't know if my lawyer
21   understands.  I just wanted this put on the record if it was
22   all right, you know, just say one thing.
23        The statutory minimum -- I mean, the statutory
24   maximum of this case which I've been charged under 371 is a
25   conspiracy.  It's a 371.  That's what brings 1791(a)(1) into

1  effect by charging me to level 26.  But the statutory maximum
2  don't provide you to give no more than five years for the 371,
3  and it states that in both of the cases that the U.S. Attorney
4  have recited, the Mack and the Cruz case.

5          MR. RAO:  Judge, he's right.  The statutory maximum
6  for Count 1 is five years, and the Government does not
7  disagree.  But the statutory maximum for Count 5 -- and that's
8  how this plea was structured -- is 20 years, Judge.  Regardless
9  of whether Your Honor were to do a consecutive sentence or
10  concurrent, the guideline range that's been proposed by
11  probation, which I don't think anyone disagrees with, 130 to
12  162, allowing defendant to argue down to 120, is still below
13  the statutory max to which he's pled guilty, because it's 20
14  years for Count 5 and five years for Count 1.

15          If you were to look at it consecutively, Judge,
16  that's 25 years.  If it's concurrently, it's 20 years.  That's
17  the statutory max.  The guidelines are still less than the
18  statutory max, so there's no problem with giving him a
19  guideline sentence which is the 11(c)(1)(c) here.

20          THE COURT:  Right.
21          THE DEFENDANT:  Okay.  I just wanted to let you know.
22          THE COURT:  I understand everything you're saying,
23  but counsel is absolutely correct.
24          THE DEFENDANT:  Okay.  But what I'm saying is that
25  1791(a)(2) is what I'm charged as.  It's not grouping.  They're

1    not grouping them.  That's what it says in my plea agreement,
2    that they're not grouping them.  So by them not grouping them,
3    the higher number supposedly eat up the lesser number, which is
4    Count 1.  That's supposed to eat up Count 5.

5    They're saying in my plea agreement that over here is
6    Count 1, and by them not being grouped, the highest one with
7    the highest numbers, that's the one you're supposed to go up
8    off of, not the one that's 1791(a)(2).  You don't supposed to
9    go off that because that's only nine levels.  By this being 13
10   levels over here, the statutory maximum is supposed to -- that
11   overrides the guideline.

12   I'm just arguing.  I just want to say that, you know,
13   I don't think the calculation is right.  But if you're saying
14   it's right, it's right.  You know, I'm just going by my
15   understanding as I've been reading it.  The same case law that
16   they got, that they put in, Judge, the same case law, Cruz
17   versus United States, Mack versus United States, it's the same
18   thing.  They was charged as I'm charged with, and the same
19   thing happened on their case.  They came back and got the
20   statutory maximum of the case, which is five years, because I'm
21   am charged up under 371.

22   I'm not arguing that I'm not guilty or nothing.  I'm
23   just arguing the calculation interpretive of my plea agreement.
24   It says as long as I can make corrections when I get ready to
25   get sentenced, and that's the only thing I was trying to do.  I

1    don't think that I'm supposed to be at no level 26.

2         Your Honor, you know, I haven't went to school on law

3    or nothing like that.  I just been going through the books and

4    doing my own research.  If you say it's wrong, then it's wrong.

5    I just want to let you know that to me, I don't think that the

6    calculation is right.

7         MR. RAO:  Your Honor, I believe Mr. West is mixing

8    apples and oranges.  The guideline calculations on one end that

9    result in a level 26 is a combined level.  For the statutory

10   maximum, we have at least 20 years.  Regardless of all that,

11   Judge, this is an 11(c)(1)(c) where the range is 130 to 162,

12   allowing Mr. West to argue down to 120.  If he is now proposing

13   to argue something below that, this plea agreement, the

14   Government would walk away from it.

15        THE COURT:  Then it's null and void.

16        MR. RAO:  He is really held to that plea agreement.

17   It's only Your Honor who could reject it by either going above

18   it or by going below it.  If that were to be the case, the

19   Government would walk away from this plea agreement because

20   this is the agreement and this is the information we had going

21   into this.

22        The Government believes the guideline calculations

23   are accurate, and looking at the combined offense level, they

24   are within -- underneath the statutory maximum.  So that really

25   should not be an issue.  But regardless of all that, this is an

1    agreed plea to a certain term where they can argue down to 120

2    and we can argue up to 162, and that's the range that Your

3    Honor can give this if Your Honor were to accept this as the

4    way to go.

5         THE DEFENDANT:  So by you saying the calculations

6    interpretation is in the plea agreement, that don't mean that

7    you can argue the calculations of the plea agreement?  I mean,

8    that's what it says in the plea agreement, that you can argue

9    the calculations interpretation of your plea agreement.

10        So if the calculations are not right, what I'm saying

11   is this.  It's like if you're up to level 100-some or you're

12   down to level 13 or 18, if the calculations is wrong, then it's

13   supposed to be corrected, and that's not a void of the plea

14   agreement.  That's what it say.

15        MR. RAO:  Your Honor, the calculations that were done

16   in the plea agreement, the final results are exactly the same

17   as how it's done by probation, the end result.  We pointed out

18   the things that need to be corrected, but the final calculation

19   which is in the plea agreement with a total offense level 30,

20   then finally getting down after the combination and making all

21   the adjustments, the total offense, probation has calculated it

22   as 27, and that's exactly the calculation done in the plea

23   agreement.  The PSR and the plea agreement do not end up with

24   different end results.  We may have gotten to the end result in

25   different ways, but the final number is the same.

1          THE COURT:  Mr. Young, do you care to address this?

2          MR. YOUNG:  Judge, I believe I've gone through the

3   calculations a number of times, including with Mr. West, and I

4   believe they're accurate.

5          THE COURT:  Okay.  I was looking for the plea

6   agreement.  Normally it's attached to the presentence report,

7   but I don't see it here.

8          THE DEFENDANT:  But I just wanted to ask one

9   question.  If it's the calculation interpretation, does that

10  mean that if they made a mistake in the calculations, you can't

11  argue the calculations?

12         THE COURT:  If there's a mistake, that's one thing.

13         THE DEFENDANT:  Right.  Okay.  That's what I was

14  saying.  There's a mistake made, and the reason why I said it

15  was a mistake is because if I'm charged with 1791(a)(2), that

16  don't -- I don't fall up under the punishment to be punished

17  under 1791(b)(1).  1791(b)(1) is just a punishment up under

18  1791(a)(1), and that's a punishment.  So if I'm charged with

19  1791(a)(2), that's a mistake.

20         But like I said, I'm not no lawyer or nothing like

21  that.  I'm just going by what I read, like that I can't be

22  punished under (b)(1).  If I'm under 1791(a)(2), I can't be

23  punished up under or cross-referenced over to bring me up to

24  level 27.  Only if I'm charged with 1791(a)(2), then I can be

25  punished up under 1791(b)(1), and it's got to be a narcotic

1   under section (c).  But I'm charged with 1791(a)(2) in Count 5.
2   That's what I'm charged with.  You've got to be charged with
3   1791 to begin the cross-reference to bring it from 13 and bring
4   it up to 26.

5           THE COURT:  But he is charged with 1791(a)(1), right?

6           MR. RAO:  He is charged with 1791(a)(1) in Count 1,
7   Judge.  Then in Count 5, it's (a)(2).

8           THE COURT:  Count 5 is (a)(2).

9           MR. RAO:  Right.

10          THE DEFENDANT:  Okay.  So it's in Count 1 where
11  1791(a)(1) is a conspiracy up under 371, which I can't be
12  charged over five years in that count.  Because it says that
13  and it's plainly stated that no matter if the 1791 is kicked
14  in, you know, it's not a serious enough charge, you're supposed
15  to go by the statutory maximum of that case which is --

16          THE COURT:  But Count 5 has a maximum of 20 years.

17          MR. RAO:  It has a statutory maximum of 20 years,
18  and I think Mr. West --

19          THE COURT:  And you're charged under that.

20          MR. RAO:  Yes, Judge.

21          THE DEFENDANT:  I'm charged up under that, but they
22  say they bring it automatically.  They say they're bringing it
23  to 26.  How did I get to level 26 by being charged with
24  1791(a)(2)?  How did I get to level 26?  The only way you can
25  cross-reference me up to level 26, I've got to be charged in

1  that count under 1791(a)(1) to be cross-referenced to bring up
2  that count.
3          MR. RAO:  Your Honor, once again, it's apples and
4  oranges.  Your Honor would not issue a sentence for each count.
5  Your Honor is going to issue a combined sentence.  The only
6  thing Your Honor needs to look at it is:  Is it below the
7  statutory maximum?  Here the combined offense level from all
8  these various counts is 27.
9          THE COURT:  It's below, yes.
10          MR. RAO:  And that includes, Your Honor, also the
11  stipulated conduct he did in the other case.  Probation has
12  taken that into account.
13          THE COURT:  Right.
14          MR. RAO:  And I would also note, Your Honor, there
15  were two additional counts that Mr. West was charged with.
16  There's two additional substantive counts that he has not pled
17  guilty to, but those would also increase his statutory maximum
18  if the Government were to go back to it.
19          It is apples and oranges.  Probation is entirely
20  correct to come up with a guideline offense level, a total
21  offense level incorporating all these various offenses, and
22  then Your Honor needs to look at the statutory maximum for any
23  sentence.
24          Regardless, Judge, post-Booker, these guidelines are
25  advisory.  I mean, this is just one factor of the 3553 factors

1   that you would look at.  They're not mandatory on you anyway.

2   You have the discretion to sentence outside of this guideline

3   range.  These are advisory, Judge, regardless.  That's

4   something Booker has done.

5           THE COURT:  But this is an 11(c)(1)(c).

6           MR. RAO:  It's an 11(c)(1)(c), but I'm saying that

7   the particular guideline range is a factor you look at to

8   decide to sentence him within the guideline range.  You're not

9   held to that, Judge.  So regardless, it doesn't make a

10  difference for Mr. West here, Judge.  He has agreed to an

11  11(c)(1)(c).

12          THE COURT:  All right.  I guess bottom line here,

13  Mr. West, if you don't want to abide by the --

14          THE DEFENDANT:  I'm going by the plea, Your Honor.  I

15  just want to let it be known what I went over and what I

16  thought.  Like I say, I may be wrong.  I can stand to be wrong,

17  but I was just letting Your Honor know how I feel about the

18  situation on the calculation.

19          I thought how I interpreted it, if the calculation be

20  wrong in the plea agreement, then I could, you know, bring that

21  to you.  At sentencing, I could bring that to you and let you

22  know I think the calculation is wrong.  I'm not saying I'm not

23  guilty because I said I was guilty, but I'm saying the

24  calculation is, I think, a few levels over what I supposed to

25  get.  That's the only thing I'm arguing.

1          THE COURT:  Well, I disagree with you.  I think the

2   calculations are correct here.

3          THE DEFENDANT:  Yes, ma'am.

4          THE COURT:  On the other hand, it's an 11(c)(1)(c).

5   If you don't want to abide by the agreement, you can withdraw

6   your plea, and we can set it for trial.

7          THE DEFENDANT:  Yes, ma'am.  I'm going to go with the

8   plea, Your Honor.  I just wanted to let you know, you know,

9   I've been doing research.  I ain't no lawyer, but I've been

10  doing my little research and that's what I was thinking, you

11  know.  I could be wrong.  I stand to be wrong.

12         THE COURT:  I think you are wrong, sir.

13         THE DEFENDANT:  Okay.  I just thought if it was under

14  1791(a)(2), I thought you couldn't be charged as you'd be

15  charged under 1791(a)(1).  It's cross-referencing.  Everything

16  I read, it say 1791(a)(1) you can cross-reference up to 26.  I

17  never read that under 1791(a)(2) you can cross-reference there.

18  That's how I get to 26, by being cross-referenced.

19         THE COURT:  Anything else, Mr. Young?

20         MR. YOUNG:  Nothing further, Judge.

21         THE COURT:  Anything else, Mr. Rao?

22         MR. RAO:  I have no other corrections, Judge.

23         THE COURT:  All right.  Will you make the corrections

24  that we've talked about?

25         MR. JACOBS:  Yes, Your Honor.  Basically in Count 1,

1   we applied it up front, and we grouped again after the

2   guidelines were to be done. So this should be 26 for Count 1

3   and 13 for Count 5. But then later when they're grouped, they

4   become 26.

5           THE COURT:  26, right.  Okay.

6       (Discussion off the record.)

7           THE DEFENDANT:  The plea agreement said they're not

8   being grouped.

9           THE COURT:  Pardon me?  Do you need more time,

10  Mr. West?

11          THE DEFENDANT:  No, ma'am.  I'm all right.  No,

12  ma'am.

13          THE COURT:  Let me ask you this.  Is there a waiver

14  of appeal in this plea agreement as well?

15          MR. RAO:  No, Judge.

16          MR. YOUNG:  No, Judge.

17          THE COURT:  Oh, okay.  So you still will have the

18  right to appeal.

19          THE DEFENDANT:  Yes, ma'am.

20          THE COURT:  All right.  Let's finish with the

21  calculations.  As I have just said, bottom line, the base

22  offense level is 26.  As an organizer/leader of this activity

23  that involved five or more participants, it will be increased

24  by four levels, which would bring it to a level 30.  The total

25  offense level is 30.

1          Then the stipulated -- or as set forth in the

2    stipulation as to the wire fraud offense, that would be a base

3    offense level of 7.  Then because the loss -- this is as to the

4    wire fraud -- because the loss exceeded $5,000, to wit it

5    involved an intended loss of $113,783.95, which is greater than

6    70,000 but less than 120,000, there will be an increase of

7    eight.  As an organizer/leader, it would be increased another

8    four levels.  So the total offense level for the stipulated

9    offense would be 19.

10         So the adjusted offense level for Count 1 and Count 5

11   is 30, and for the stipulated offense it's 9.  So the greater

12   adjusted offense level would be the appropriate one.  So we

13   have -- well, you get a three-level reduction for your

14   acceptance of responsibility by pleading guilty and notifying

15   the Government of your intent to do so.  That would bring it

16   down to a total offense level of 27.

17         He's in a criminal history category of 6, is it?

18         MR. YOUNG:  Yes, Judge.

19         THE COURT:  Okay.  So we have a 27 offense level at a

20   criminal history of 6, which has a range of 130 to 162 months.

21      (Discussion off the record.)

22         THE COURT:  Tell me about the upward departure.

23         MR. RAO:  Well, Your Honor, there's no upward

24   departure.  What's in the agreement for the plea, the defendant

25   is allowed to actually argue down to 120 months.  Even though

1   the guideline range is 131 to 162, we've entered into an
2   11(c)(1)(c) for them to argue down to 120 months and for the
3   Government to be able to argue up to 162.

4          THE COURT:  Okay.  Just for the clarity of this
5   presentence report, I guess I'm a little confused here on page
6   42 where there's a reference to 188 months based upon an upward
7   departure.

8          MR. JACOBS:  That's correct.  On page 41, the factors
9   that may warrant a departure, it states that Your Honor could
10  move up if the criminal history category doesn't adequately
11  reflect the criminal history.  13 points is highest cutoff for
12  category 6, and the defendant has 48 criminal history points.
13  So it's based on that.

14         THE COURT:  All right.  Mr. Young, do you care to
15  speak in mitigation on behalf of Mr. West?

16         MR. YOUNG:  Yes, Your Honor.  Could I also point out,
17  however, one other nonguideline correction?  That is on page
18  37, second paragraph, line 824.  It's indicated:

19         "Defendant relayed he is unsure if he would want or
20  benefit from substance abuse."

21         I don't believe that's the defendant's position.

22         THE COURT:  I'm sorry.  What line?

23         MR. YOUNG:  824, Judge, the second paragraph.

24         THE COURT:  Okay.

25         MR. YOUNG:  I do believe that Mr. West certainly

1   realizes the problem that he has and that he would benefit from

2   treatment, so I just wanted to point that out, Judge.  I don't

3   think that statement is necessarily consistent with his belief.

4           THE COURT:  Okay.  Is that correct, sir?

5           THE DEFENDANT:  Yes, ma'am.

6           THE COURT:  All right.  Do you want to change that?

7           MR. JACOBS:  Based on my interview, that is what he

8   responded.

9           THE COURT:  Well, now he's responding differently.

10          MR. JACOBS:  Okay.

11          THE COURT:  Okay.  In essence, we're saying -- well,

12  you can probably just leave it out.

13          MR. YOUNG:  That would be fine.

14          THE COURT:  Okay.  Mitigation?

15          MR. YOUNG:  Yes, Judge.  Essentially, Mr. West has a

16  very extensive criminal history.  Basically when you look at

17  his involvement in all these offenses, it all goes back to the

18  same thing, and that's drug use.  He knows that he has a

19  terrible addiction, has had it for many years, and it's so

20  strong that, unfortunately, he would do almost anything to

21  allay this addiction.  This is why he's repeatedly had these

22  problems.  Unfortunately, family members were drawn in.  It's

23  really a very disastrous situation, not just in terms of him,

24  but the fallout to other people.

25          Mr. West has spent a lot of time incarcerated;

1   however, I don't believe he's ever really had any serious

2   intensive drug treatment.  I think he will tell you himself

3   that he really has to deal with this addiction or he's just

4   going to end up right back where he is right now.

5        In terms of the sentence, Your Honor, Mr. West will

6   turn 48 later this year.  Even if Your Honor were to give him

7   the low end, the lowest possible sentence, he'll be in his late

8   50s and almost 60 years of age by the time he's released.

9   Certainly at that point in his life, he would have to seriously

10  consider whether or not he's going to deal with this addiction.

11       In the final analysis, Judge, I think that the

12  difference that you have to consider in terms of the range of

13  the sentence, whether it be 10 years or 13 years, if Mr. West

14  has not solved this problem and got his act together in 10

15  years, I don't think another three is going to matter.

16       I think only you can determine whether or not he has

17  in his heart the decision to really come to grips with this

18  problem that has devastated a lot of people.  That's all I have

19  to say, Judge.

20       THE COURT:  Mr. West, do you care to speak on your

21  own behalf, sir?

22       THE DEFENDANT:  Yes, ma'am.

23       MR. RAO:  Your Honor, before he does speak, could the

24  Government provide aggravation?  I don't know if you're going

25  to want it at the very end, but I wanted him to be able to

1  respond to it and not have to do it afterward, if you don't

2  mind.

3          THE COURT:  Okay.  If I let the Government speak in

4  aggravation, then you can speak to that as well.

5          THE DEFENDANT:  Yes, ma'am.

6          THE COURT:  Go ahead.

7          MR. RAO:  Your Honor, Mr. Young said to blame this on

8  drug use.  With Mr. West, you cannot blame this on drug use.

9  As you've seen from his conduct, he's articulate.  He's smart.

10  He's not some puppet.  The puppets, as far as Mr. West goes,

11  those were all the people that he ensnared into his scheme.

12          Your Honor, what I did is I went through all the

13  sentencing J&C's, not only for the four co-defendants in this

14  case, but the four co-defendants in the other case before Judge

15  Gottschall.  Denise West got a sentence of 40 months.  Mable

16  West got 30 months.  Emma Clark got 26 months.  Willie Davis

17  got 38 months.  Your Honor gave those sentences, and all four

18  of those co-defendants cooperated.  Rose Gibson in the other

19  case got pretrial diversion.  Felicia Bradley got five months.

20  Jacqueline Hall got five months.  Bryant Jones got four months.

21  If you total all those up, that's 148 months of sentences that

22  were meted out to these eight people who were ensnared into

23  this scheme by this man.

24          Look at the impact on the family.  Two of his own

25  sisters, Mable and Denise, were sentenced by this Court.

1   Neither one of them can take care of their children now because
2   they're going to be gone for more than four years.  Denise, as
3   she came and told you, she can't take care of her parents, and
4   one of those parents is his parent.  So the impact on the
5   family done by this man has just been tragic.

6        As to the impact on the community, Emma Clark, I
7   believe she has six or seven children.  She's not even going to
8   be able to care for those children because she's going to be in
9   prison.  Felicia Bradley and Jacqueline Hall, although they had
10  smaller sentences, I was there for their sentencings, Judge,
11  and they were crying because they had to leave their children
12  for five or six months.  For Jacqueline Hall, one of those
13  children, one of her children is also one of his children.

14       So we're talking about not only the impact on his
15  sisters, his parents, and their children, but he's also
16  impacted his own children.  All the other defendants, Judge,
17  they won't be around, and their community has been affected,
18  also.

19       His criminal history is 48 points.  The Government is
20  not asking for an upward departure, and we can't because of the
21  plea.  But looking at the extent here, looking at the extent of
22  what this is, the last two crimes he committed, Judge, were
23  both from prison.  The insurance fraud was in Oklahoma.  When
24  he was in prison, he committed that fraud and brought all these
25  people in.  Then he smuggled the drugs in.  He's in prison

1    right here at the MCC, and he does that.

2            He has had no respect for this Court.  He pled guilty

3    on September 9th, 2005, and he cried his crocodile tears.  Do

4    you know what he did after that, Judge?  Three months after

5    that, he drops dirty for marijuana at the MCC.  We had provided

6    the report to both counsel and you the last time we were.  When

7    he's confronted about the drop, he didn't admit it.  This is

8    two or three months after he pled guilty to you, and what he

9    said was that that's a result of secondhand smoke.  The report

10   showed that only when he's confronted with the dirty drop, the

11   test results, then he says:  Yeah, okay, I used the drugs.

12           This is from a man who came and pled guilty and cried

13   and said he was very sorry for smuggling drugs into the MCC.

14   He's continued to use drugs.  Where do those drugs come from,

15   Judge?

16           He's a man in denial because, as the probation

17   officer just stated, page 37, line 824, he told him he was

18   unsure whether he would want or benefit from substance abuse

19   treatment.  Sure, today, you know, he's saying something a

20   little different.  But when he was interviewed by probation in

21   the pretrial report, that's what he said, and the probation

22   officer just said that.  He's a man in denial.

23           He's also lied to probation.  Looking at the PSR,

24   there are so many examples, but I will pick one out, page 37,

25   line 74.  When he was questioned about a tattoo he had, a

```
 1  six-point star, he said it's a symbol of the Jewish religion,
 2  that that's why he has it.  Shortly thereafter --
 3            THE COURT:  Page 37?
 4            MR. RAO:  Page 37, line 774, Judge.  I'm sorry.  It
 5  must be page 36, Judge.
 6            THE COURT:  Page 34?
 7            MR. RAO:  I apologize, Judge.  You're correct.  Well,
 8  it's 35.  It's page 35, line 774:
 9            "The defendant initially advised this officer that
10  this tattoo was a symbol" --
11            THE COURT:  Read slower.
12            MR. RAO:  Oh, slow down?  I'm sorry.
13            "The defendant initially advised this officer that
14  this tattoo was a symbol of his Jewish religion.  However, he
15  later advised the tattoo was a symbol of the Gangster Disciples
16  street gang which he reported being a member from 1970 to
17  1980."
18            This man is a liar.  He lies about things that he
19  shouldn't have to lie about.  He's supposed to be truthful to
20  probation, but he's lying about a gang tattoo and saying it's
21  because he's Jewish.
22            His conduct is especially bad, Judge.  He distributed
23  drugs at the MCC where the inmates that are there, their will
24  power is at their weakest.  A lot of them are drug addicts and
25  have substance abuse problems.  They go to classes there.
```

1   They're trying to kick the habit, and what he does is he brings

2   drugs into the very place where people are at their weakest and

3   makes it a dangerous situation.  That's only not for the

4   inmates that are doing these drugs, but we're talking about the

5   officers and marshals that are there, Judge, that have to be in

6   a building with a very dangerous situation, people awaiting

7   trial, people who have been convicted.  What he does is he

8   brings them drugs and makes a situation much more dangerous.

9            Looking at the factors of 3553, Judge, there are many

10  factors you need to consider.  One is the nature and

11  circumstances of the offense.  What he did is really a heinous

12  crime, and he's not remorseful.  I mean, notwithstanding those

13  tears that he shed at the plea, his scheme has ensnared those

14  who are weaker than him.

15           THE COURT:  I'm sorry?  His what?

16           MR. RAO:  His scheme has ensnared those who are

17  weaker than him, all of them.  Rose Gibson, Emma Clark, and

18  Bryant Jones were all drug users at the time they were snared

19  into his scheme.  Denise West and Mable West also had drugs

20  issues, his own sisters, and he had them smuggling drugs into

21  the MCC.

22           The second factor is looking at the need for the

23  sentence that's imposed to reflect the seriousness of the

24  offense, promote respect for the law, and to provide a just

25  punishment.  The Government would argue that the highest

1   sentence you can give according to this plea agreement, 162
2   months, would accomplish that.  That is a reasonable sentence.

3         Another factor is to afford adequate deterrence to
4   criminal conduct.  By giving the highest sentence, Judge, you
5   send a message that this Court will not accept prisoners like
6   Mr. West smuggling drugs into the MCC and committing crimes,
7   whether it's insurance fraud or drug smuggling, while they're
8   in prison.  They're in there to rehabilitate themselves, to
9   take vocational training, to take drug and substance abuse
10  programs.  They're not in there so that they can commit
11  additional crimes.  By giving the highest sentence, you send
12  that message.

13         Also, another factor is protecting the public from
14  further crimes by the defendant.  Mr. Young says, yeah, an
15  additional three years might not make a difference, but look at
16  what Mr. West has done while he's incarcerated.  Just imagine
17  what he's capable of.  Those 48 criminal history points show us
18  that he has not learned his lesson.  For what he's capable of
19  if he's outside, the highest sentence you can give, 162 months,
20  would help provide some insurance.  Those three years could
21  make a difference for a lot of people, a lot more victims that
22  would be victimized by Mr. West.

23         Finally, there's additional factors of providing the
24  defendant with needed educational or vocational training and
25  medical treatment.  This really is not an issue as far as

1  punishment goes.  Mr. West claims to have some medical

2  problems.  The Bureau of Prisons has the facilities to more

3  than adequately treat them.  He's been in BOP now for a couple

4  of years.  He's been treated, and he's been fine.  He's even

5  been provided glasses, so he's gotten treatment.

6           The kind of sentence that's available to you is 130

7  to 162 years.  That's the guideline range.

8           THE COURT:  Months.

9           MR. RAO:  Months, yes.  Sorry, Judge.  The guideline

10 range has been taken down to 120 months because of the plea.

11 The statutory maximum is five years for Count 1 and 20 years

12 for Count 5, well within the guideline range, well under the

13 what the guideline range would be.

14           One other factor that I need to bring to your

15 attention, Judge.  1791(c) provides for consecutive punishment.

16 In this case, it says any sentence imposed for this particular

17 crime has to be consecutive with the sentence that the

18 defendant is serving.

19           The defendant, it's the Government's position that

20 the defendant was serving a -- was not serving a sentence.  He

21 was being held by Judge Gottschall pending trial in the other

22 case.  So there's no federal sentence in play here.  There was,

23 however --

24           THE COURT:  Has he been sentenced in that case?

25           MR. RAO:  He has not, Your Honor.  Part of the plea

1    agreement is that the Government, after this particular

2    sentence, would go and dismiss the other case.

3             THE COURT:  I see.

4             MR. RAO:  There is, however, Judge, some state

5    sentences that Mr. West was serving.  I think those are long

6    done.  That's my understanding.  But any sentence imposed by

7    the Judge -- and this would be up to the Bureau of Prisons,

8    it's my understanding -- could be consecutive to those state

9    sentences.

10            THE COURT:  Are they or are they not still in

11   existence?

12            MR. RAO:  My understanding is they're not.  He has

13   finished all his state sentences.  But that's a calculation the

14   Bureau of Prisons would do.

15            THE COURT:  Okay.

16            MR. RAO:  I just wanted to point that out and make

17   that point to the Court.  I talked to Mr. Young about that.

18   That's not in the plea agreement, and it doesn't need to be

19   because it's by statutory -- it's statutory, 1791(c).  There's

20   nothing that we could agree to that's different than that, and

21   there's nothing this Court could do different than how that

22   would operate.

23            Finally, Judge, one of the other factors is looking

24   at the disparity.  All the co-defendants received a much

25   smaller sentence than what the Government is recommending here,

1   162 months, but that's appropriate.  The bulk of those people
2   cooperated with the Government, and their roles were much less
3   here.  This is the leader, this is the organizer, and these
4   eight people were brought into it by him.  A sentence of 162
5   months is the appropriate one, Judge, and that's the sentence
6   the Government would recommend.

7           THE COURT:  Mr. West, you may speak on your own
8   behalf, sir.

9           THE DEFENDANT:  Yes, ma'am.  Yes, Your Honor.  I know
10  what I did was wrong, and I admitted to that, but he's making
11  it seem like -- you know, we all had drug problems.  Every
12  person that he named had drug problems.  The only way they
13  could feed their drug problems was for me to help them, and I
14  was helping them from in here when I had a drug problem.  So by
15  me helping them out, then they was helping me out.

16          THE COURT:  You were helping them out by feeding
17  their drug problems?

18          THE DEFENDANT:  Because they was -- what I'm saying,
19  I didn't realize I was trying to take advantage of them people,
20  Your Honor.  Them people was coming to me, and they were
21  saying:  Well, we want to do this.  We want to do this.  You
22  know, let's get some drugs.

23          So I said:  Okay.  Well, you can go do this.  You can
24  go do this.

25          We all was doing drugs together.  They was on the

1  street doing drugs, and I was in here doing drugs.  The only
2  way they was going to get drugs was for me to help them get
3  drugs, so we all was doing them together.  It wasn't like I was
4  trying to sell no drugs.  It wasn't like I was trying to give
5  nobody no drugs.  When they brought me the drugs, which was
6  three dime bags one time, three dime bags another time, and
7  three dime bags another time, it was about two or three
8  different times where they came and brought me three dime bags.
9          THE COURT:  What's a dime bag?
10         THE DEFENDANT:  It's like a -- it cost $10.
11         MR. YOUNG:  It's a gram, right?
12         THE DEFENDANT:  No, a tenth.  It's a tenth.  It's a
13 tenth of a gram in each bag, which all them together would have
14 added up to about probably a gram, all of them together.  They
15 did this on the holidays when they brought me that.  I know it
16 was wrong, you know, for me doing it, and I done got older and
17 I done got wiser.
18         I have been down 12 years straight, and I have a drug
19 problem.  I've been asking for help for my drug problem.
20 People who don't do drugs, they don't realize how it is.  Drugs
21 make you manipulated.  Drugs make you trying to find a way
22 every night how you going to get up the next day and fool
23 somebody or snatch somebody's purse or rob somebody.  You know,
24 drugs have you thinking like that.  When you get clean, you
25 don't think like that, but drugs have you to have a manipulated

1  mind because heroin do that to people.  That's the baddest drug
2  you can ever want to toot because you be sick.  If you don't
3  have it, you be sick.
4           THE COURT:  That's what this was, heroin?
5           THE DEFENDANT:  Yes, ma'am.  You be sick.  Once you
6  -- once I tooted the first time, then I'm gone.  I mean, I just
7  got to have it.  You know, any kind of way I can think to tell
8  somebody to do it, that's what I do.  At the same time, they
9  need it on the street because they sick out there on the
10  street, and I need it in here.  So we say:  Okay.  Then how can
11  we get us some money?  Okay.  Well, go over here and do this
12  and do this.  Okay?
13           They get the money out there, and they do what they
14  going to do, but they make sure I have some dope in here for me
15  to do.  Not one time did I sell no dope to nobody.  They
16  brought that to me.  They making it seem like I manipulated
17  them to do this.  No, they did what they wanted to do because
18  they was having the money.  I didn't have it.  I don't have no
19  money.  I don't have nothing.  They was having the money out
20  there on the street.
21           They was doing their own thing out there on the
22  street, and we was doing dope together.  Everybody knew what
23  they was doing.  All us being dope fiends, everybody knew what
24  they was doing.  When you're doing dope -- and I've been
25  needing help.  I've been down 12 years, and I haven't gotten no

1  help.  I've been begging for help.  I've been needing a drug

2  program.  I've been asking for it, but don't nobody want to

3  help me.  All they want to do is say:  You don't need no help.

4        I take medication, depression medication.  I tell

5  these people when I have talked to the psychiatrists, and they

6  continue to say the same thing I'm telling you.  When I stop

7  taking my medication, I start doing things that I normally

8  wouldn't do.  I hear voices.  I've been diagnosed of it, and

9  I've been taking medication for nine years.  They took me off

10 my medication.  At the time that this stuff went down at the

11 MCC, they took me off my medication.  The other times, I would

12 have said:  No, don't bring me this.  No, I'm not going to do

13 this.

14        But at that time I was off my medication, and I just

15 said:  Go ahead and start bringing it.

16        Once they brought it the first time and I tooted the

17 first time, then they was saying:  How can we get some more?

18        At this time, you know, all I'm doing is asking.  I'm

19 not saying I'm not supposed to get 13 years.  I'm not saying

20 that because I know how my record is, you know, and I know the

21 things that I've been doing that was wrong.  I haven't sold no

22 drugs out there.  I haven't killed nobody.  I never hurt

23 nobody.  The only thing I've been convicted of is doing drugs,

24 being a dope fiend, being sick.  My whole record, I'll let you

25 know that's all I've been guilty of, being a dope fiend.

1          I don't have nothing.  I don't have no house.  I
2    don't have no car.  I don't be out here up and down the street
3    selling people dime bags and rocks and dope and all that.  I
4    don't do that.  I just do it, and I'm charged with doing dope,
5    them bringing me dope and me tooting.

6          For being a dope fiend, I'm fitting to get 13 years.
7    Maybe that's my fault for being a dope fiend, but I've been
8    asking.  I'm asking for somebody, and I'm asking you to help
9    me.  If you can help me get into a program, I would appreciate
10   it very much because I've been asking this for the whole 12
11   years.

12         I haven't been on the street for 12 years.  That's
13   why these people come to me, because they know I'm addicted to
14   heroin.  So they come to me while I'm in jail and ask me
15   because they know I'm weak.  So then it makes it look like I'm
16   manipulating them by them coming to me and saying they'll bring
17   me a bag of heroin:  Here, take this.

18         I toot it, and now I'm gone.  Now I'm ready:  Okay,
19   let's do something now.

20         I want another toot, so I'm going to start putting my
21   head together saying:  Well, this is what you all do because I
22   need some more.

23         When it first start off, they trick me.  They bring
24   me the stuff and say to go on and toot this.  Once you toot it,
25   then you want some more.  Then you want some more.  So they

1    know I got the resources and the mind to show them how to get
2    more.  Because they on the street and they ain't getting
3    nothing to get high for, if they come ask me, I say:  Well,
4    okay.  Go do this and go do this, and then you can have some
5    dope and bring me some.

6            But it all start off -- don't nobody realize that it
7    all start off by they bringing me that first bag.  I tried to
8    keep myself clean, and there's more dope, Your Honor, in the
9    prison system almost than there is on the street.  Ain't no
10   drug program for no prisoner at the MCC.  Ain't no drug program
11   there.  You can verify for yourself there's no drug program
12   there, and there's dope there that you can do.

13           Yeah, I'm addicted to dope.  Somebody came and gave
14   me some dope three months ago.  I know I could have said no,
15   but I didn't say no.  I took it, and I did it.  I didn't never
16   tell you -- I told you and gave my word when I gave the plea
17   agreement that I will never try to smuggle no more drugs or
18   nothing inside the prison.

19           When it come to dope, Your Honor, I'm weak.. I'm a
20   weak individual when it come to dope.  All I do is just pray to
21   God to make me strong enough so that I can try to do this bit,
22   try to go through a drug program, then be out to help my
23   family, my mother and father, because they is old.  I know I
24   probably won't be able to see them no more because they done
25   got old, and I'm hurting them.  My sister, all of them, I hurt

1  them.  But at the same time, they hurt me because I believe
2  they never should have brought it to me.  They know how I am
3  when I start.  If they don't never come over here and bring me
4  nothing, I don't never start it because I don't never get it,
5  but it ain't looked at that way.  It's looked at that I'm
6  tricking them to bring me something.  I didn't do that to deal.
7  All I got was a high.

8       When you start getting high on heroin, that's all you
9  want.  That's all you want to do, just get high.  When you
10 toot, you say:  Well, I'm going to toot some Monday, and I
11 ain't going to do none Tuesday.

12      But when you wake up Tuesday, you be a little sick,
13 so you want to toot some more.  Then you want some more that
14 Wednesday, and you want some more that Thursday because you
15 sick.  It's hard for me to explain to you because I know you
16 have never used.  It's hard for me to explain to a lot of
17 people how heroin has your mind.  It have you manipulated.  It
18 have you wanting to do these things.  It have you doing things
19 bad.

20      But, you know, like I said, I haven't hurt no one.  I
21 haven't killed nobody.  All I'm asking is just for a little
22 leniency, and I'm asking, you know, if there's any kind of way
23 possible I can get the drug program.  I need some help.

24           THE COURT:  Well, that definitely will be --

25           THE DEFENDANT:  I need some help, Your Honor.

1          THE COURT:  -- a recommendation.

2          THE DEFENDANT:  You know, people make me out to be a

3    bad guy, Your Honor.  I'm not no bad person.  You know, I do

4    things to help people.  I've helped my people.  I've helped my

5    wife.  As soon as I helped everybody and all these things that

6    I did for people, it looks bad on me, yeah, because I did these

7    things, but ain't nobody accomplished nothing but the people on

8    the street.  Now I'm left with nothing.  I helped my wife out

9    and do things.  When I helped her out to get the money, she

10   gone now.  She got her car, and she got her house, and I don't

11   have nothing.

12          I help all the people out there.  Jacqueline Hall,

13   all them people out there that he named, I helped them.  They

14   benefited from me, and then they left me out here.  But then

15   when they come to court, they want to come to court and cry and

16   say everything is my fault.  Do you know why it's my fault?

17   Because I'm locked up already, and they can put this on me

18   because I have a bad record and it's my fault.

19          But never one time, if anybody is a dope fiend, if

20   anybody is a user, they know when you bring them that first

21   one, when you bring them that first hit, they off to the races.

22   That's how it got me every time.  When I was by myself, wasn't

23   getting no business or nothing, I was all right.  But as soon

24   as I came here and they brought me that first hit to get me

25   started, that's what started everything.

1          THE COURT:  All right.  Well, Mr. West --

2          THE DEFENDANT:  I'm sorry, Your Honor.  You know, I'm

3    really, truly sorry for the things I did.  I know I don't sound

4    like I'm sorry because of everything everybody said, everything

5    the U.S. Attorney said.  I'm sorry for my family.  I'm sorry

6    for my sister and them.  You know, I'm sorry because we just

7    dope fiends.  I mean, I'm just a dope fiend.  I just need some

8    help, Your Honor, and I'm just --

9          THE COURT:  All right.  I'm going to do the

10   following.  This is a very sad story.  This is most

11   unfortunate, and the Court looks at you as a person who --

12   there's no question about the fact that you've got a very

13   checkered past.  You've done a lot.  You've committed a lot of

14   criminal offenses, and you've acknowledged it.

15          It's clear that probably the reason that most of

16   these criminal offenses have been committed is due to the fact

17   that you have this scourge on your back, the scourge of

18   society, this drug addiction, which in this Court's opinion

19   turns out to be an illness.  There's no question about that.

20   With 48 criminal history points, you committed a lot of crimes.

21   I wouldn't necessarily say there are no mitigating factors

22   because I think that in mitigation the Court has to take into

23   account the fact that you are sick.

24          I'm going to impose the following sentence.  Taking

25   this all into account, I'll go with the low end of the

1  guideline range.  It's conceivable that if I go with the high

2  end, obviously, that will keep you in custody longer, but maybe

3  that's not really the answer to this whole dilemma.  The answer

4  to this dilemma is to see if there can be some kind of

5  treatment that will afford you some semblance of a decent life

6  at some point in time in your life.

7          So I'm going to commit you to the custody of the

8  Bureau of Prisons for a term of 130 months.  Once you're

9  released -- well, if there are any undischarged state

10  sentences, unfortunately, that would have to be consecutive to

11  the sentence that I'm imposing.  After you're released from

12  incarceration, you will be on supervised release for a period

13  of three years on each count, but they will run concurrently.

14          What's the restitution for?

15          MR. RAO:  It's restitution for the stipulated

16  conduct, Judge.

17          THE COURT:  Oh, the wire fraud?

18          MR. RAO:  The insurance fraud, yeah.

19          THE COURT:  I'm required to include that as a

20  condition of your supervised release.  You have to pay the

21  restitution, and that's in the amount of $61,943.29.  You have

22  to pay a special assessment.  It's $100 per count, and there

23  are two counts.  So that will be $200.  You will have an

24  opportunity while you're incarcerated to participate in the

25  Inmate Financial Responsibility Program which will allow you to

1   make some money that will go towards the $200 special
2   assessment.  I will waive the cost of custody and the cost of
3   supervision, and I will waive the interest on the restitution.
4           Once you're released from imprisonment, you will be
5   placed on supervised release for three years.  Within being
6   released -- within 72 hours of your release, you must report to
7   the probation office in the district to which you're released.
8   While you're on supervised release, of course, you understand
9   that you can't commit any further offenses.
10          THE DEFENDANT:  Yes, ma'am.
11          THE COURT:  You can't commit federal crimes.  You
12  can't commit any state crimes.  You can't commit any local
13  crimes.  If you do, you'll come right back before this Court
14  and go right back to jail if you're found guilty of such
15  violations.
16          THE DEFENDANT:  Yes.
17          THE COURT:  Additionally, you are to participate when
18  you're released in a drug aftercare treatment program which
19  would include -- may include urine testing at the direction of
20  the probation officer.  You are to undergo a mental health
21  evaluation and treatment at the direction of the probation
22  office.  If medicine is prescribed as a result of those
23  evaluations, that will be a condition that you must abide by.
24          You are not to incur any new credit charges once
25  you're released or open any additional lines of credit without

1   your probation officer approving that unless you are in

2   compliance with the restitution order which will be on an

3   installment basis.

4        Of course, you cannot possess a firearm, you cannot

5   possess any destructive device, and you shall cooperate in the

6   collection of DNA, should the Probation Department request that

7   you do so.

8        I'm also going to recommend that you be placed in a

9   facility that has a drug treatment program so that while you

10  are incarcerated, you will be able to receive some kind of

11  treatment which will hopefully help you to become a useful

12  member of this society.

13       Are there any questions, sir?

14       MR. RAO:  Your Honor, I think the only thing is the

15  drug testing.  I don't know if you said it and I missed it, but

16  it has to be less than 104 per year.

17       THE COURT:  104, yes.  The urine testing cannot

18  exceed 104 tests per year.

19       I would advise you, Mr. West, that you do have a

20  right to appeal.  Should you wish to do so, you must within ten

21  days of today's date file a written notice of appeal with the

22  clerk of the court.  If at that time you cannot afford your own

23  attorney or a transcript of any of the proceedings involved in

24  this matter, they will be provided to you free of charge.

25       Are there any questions?

1          MR. YOUNG:  Judge, would Your Honor also consider

2    waiving the cost the incarceration?

3          THE COURT:  I did.

4          MR. YOUNG:  Oh, you did?  Okay.  I wasn't sure.

5    Thank you.

6          THE COURT:  I waived all costs of incarceration as

7    well as supervision.

8          MR. YOUNG:  Thank you.

9          THE DEFENDANT:  Excuse me, Judge Manning.

10          THE COURT:  Yes, sir.

11          THE DEFENDANT:  I was wondering, with all due

12    respect, if I could try to get recommended for Oxford, having a

13    good drug program.

14          THE COURT:  They're not going to take you at Oxford.

15          THE DEFENDANT:  Pardon me?

16          THE COURT:  I don't think they're going to accept you

17    at Oxford.

18          THE DEFENDANT:  No?

19          THE COURT:  I'll make the recommendation for what

20    it's worth.  I cannot dictate to the Bureau of Prisons where

21    you go.  I can merely make a recommendation, and my major

22    recommendation is that you go to some facility that will help

23    you --

24          THE DEFENDANT:  Yes, ma'am.

25          THE COURT:  -- in terms of giving you some kind of

```
 1   drug treatment, because obviously you need it desperately.
 2              THE DEFENDANT:  Yes, ma'am.
 3              THE COURT:  So that would be first and foremost.
 4   Secondly, I will make a recommendation that it be somewhere
 5   close.  I assume you want it to be close to Chicago so that
 6   your family can visit you?
 7              THE DEFENDANT:  That's why I asked for Oxford.
 8              THE COURT:  I'll make that recommendation, but I have
 9   no way of telling you that it's going to be there.
10              THE DEFENDANT:  Yes, ma'am.
11              THE COURT:  It's going to be up to them once they
12   take you into their evaluation system and decide what's best
13   for you and for them.
14              THE DEFENDANT:  Yes, ma'am.  The only reason I asked
15   for that is because it's close.  It's the closest one around
16   Chicago.
17              THE COURT:  Right, I understand.  But like I said,
18   they're going to make their own determination based upon your
19   background, based upon the charges that you've been convicted
20   of, and based upon your needs and their facilities.
21              THE DEFENDANT:  Yes, ma'am.
22              MR. YOUNG:  Judge, if I could just mention, I have
23   tried to explain this to Mr. West.  I talked to BOP about the
24   drug program and recommending a specific facility.  They
25   informed me that if an individual wants the drug program, it's
```

1    better not to recommend a specific institution.  In that way,

2    he can go wherever the program is available.  As long as

3    Mr. West is aware of that and he still wants to request Oxford,

4    that's fine.

5              THE COURT:  Well, like I said, my recommendation is

6    going to be based primarily upon the fact that Mr. West needs

7    treatment desperately.  So that will be first and foremost in

8    my mind as I make the recommendation, and I'm sure that will be

9    first and foremost with the powers that be in the prison system

10   as well.

11             THE DEFENDANT:  And I got --

12             THE COURT:  You'll be given credit for time served as

13   well.

14             THE DEFENDANT:  I got, you said, the low end of my

15   plea?

16             THE COURT:  The low end, that's 130 months.

17             THE DEFENDANT:  Thank you.

18             THE COURT:  All right.

19             MR. RAO:  Your Honor, the Government would make a

20   motion to dismiss Counts 2 and 4.

21             THE COURT:  That will be order.  Good luck to you,

22   sir.

23             THE DEFENDANT:  Thank you, Your Honor.

24             MR. RAO:  Judge, I just want to be clear.  Just for

25   the record, when you say "time served," that's as long as it

1    comports with 1791(c) for the consecutive sentence, is that

2    right?

3              THE COURT:  Correct.

4              THE DEFENDANT:  What's that?

5              THE COURT:  You can explain to him what you're

6    talking about.

7              THE DEFENDANT:  Judge, could I just ask one more

8    question about my plea?

9              THE COURT:  Yes, sir.

10             THE DEFENDANT:  I was wondering, you know, can I be

11   eligible for -- when I leave the prison system, will I be

12   eligible for home confinement or community service?  Because

13   I'm sentenced under zone C, when do I be eligible for that?

14             THE COURT:  I thought it was zone D.

15             THE DEFENDANT:  Zone C.

16             MR. RAO:  Zone D, Judge.

17             THE COURT:  I was under the impression it was zone D.

18             MR. RAO:  Judge, an offense level of 27 at 6 is zone

19   D.

20             THE DEFENDANT:  27 is C right here, and zone D start

21   at 28.

22             THE COURT:  Well, you know, we're talking somewhere

23   down the line, but the Probation Department will be the one to

24   make that determination.  Obviously, if you're dissatisfied,

25   you can seek counsel from the Court.

1          THE DEFENDANT:  Okay.

2          THE COURT:  All right?

3          MR. YOUNG:  Thank you, Judge.

4          MR. RAO:  Thank you, Your Honor.

5       (Proceedings concluded.)

6             C  E  R  T  I  F  I  C  A  T  E

7          I, Patrick J. Mullen, do hereby certify that the
foregoing is a complete, true, and accurate transcript of the
8  proceedings had in the above-entitled case before the Honorable
BLANCHE M. MANNING, one of the judges of said court in Chicago,
9  Illinois, on March 9, 2006.

10

11                              Official Court Reporter
                              United States District Court
12                              Northern District of Illinois
                              Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25